1. The evidence authorized the jury to find the defendant guilty. This is true irrespective of whether the defendant Patterson was a joint conspirator with Boyd, who was also indicted, so as to render each responsible for the act of the other, or whether Patterson acted purely on his own impulse. The evidence authorized a finding that Patterson inflicted the mortal wound, in that when Boyd backed the retreating Johnson, the deceased, into the back dark room, they were followed by Patterson, who joined in the altercation with an open knife in his hands; that the decedent died from knife wounds, one of which severed his jugular artery; that the deceased, before his death a few minutes later, on reaching the home of a neighbor several doors distant, at which Moon Mulling was present, cried out, "Moon, Moon, Henry, Henry," which the jury were authorized to interpret as an effort to connect "Henry" with the homicide; and that, when Moon Mulling asked Johnson who cut him, he said, "Henry," the evidence showing that the defendant, Henry Patterson, was the only person involved by the name of Henry. Moreover, it appears from the evidence that the defendant asked Moon Mulling who had cut the deceased, to which Mulling replied, "You are the one that cut him," and the defendant said, "I know it, I know it." Such a finding *Page 774 
was authorized, irrespective of the fact that the other party indicted, Mose Boyd, told another witness: "I stabbed at him; I don't know whether I hit him or not because it was kind of in the dark."
2. The court did not err in failing to charge the contention of the defendant as to an alibi. There was nothing in his statement to the jury to contradict the evidence that the defendant followed Johnson, the deceased, with an open knife behind the man who was backing Johnson into the corner of a dark room. On the contrary, in his statement he said: "I was there, but I didn't do nothing to him." Moreover, even if the defendant had in fact by his statement raised the defense of alibi, it was not error, in the absence of evidence on this subject, for the court to fail to charge thereon, in the absence of a written request so to do. Watson v. State, 136 Ga. 236 (5) (71 S.E. 122).
3. The judge instructed the jury that the defendant had entered a plea of not guilty of the offense charged, and "is presumed by law to be innocent of that charge until and unless the evidence satisfies your minds beyond a reasonable doubt; the burden of such proof is on the State." The statement of the defendant amounted in substance to a mere plea of not guilty; that portion which dealt with the homicide itself merely stating that, "as far as me having anything to do with it, I didn't have nothing to do with it; I was in there but I didn't do nothing to him." If the defendant desired any more detailed instruction as to what he might have conceived to be some particular line of defense contained only in his statement to the jury, he should have made a proper request therefor.
Nor was it detrimental to the defendant for the court, especially under the particular facts and circumstances of this case where there was no actual eye-witness to the homicide itself, to have given the defendant the benefit of the defense of justifiable homicide, even though be might not have been entitled thereto. This court has so held on numerous occasions. See Green v. State, 153 Ga. 215 (4) (111 S.E. 916); Ward v. State, 184 Ga. 566 (2) (191 S.E. 916), and citations.
4. "Declarations by any person in the article of death, who is conscious of his condition, as to the cause of his death and the person who killed him, shall be admissible in evidence in a prosecution for the homicide." Code, § 38-307. To render a dying declaration admissible in evidence, belief of the party that he is dying, as well as the fact that he is actually in extremis, is essential, but such consciousness may be inferred not only from his statements but from the nature and character of the wound and other attendant circumstances. Campbell v. State, 11 Ga. 353 (3); Dumas v. State, 62 Ga. 58
(2); Robinson v. State, 130 Ga. 361 (6) (60 S.E. 1005); Jones v. State, 150 Ga. 775 (105 S.E. 495); Coart v. State, 156 Ga. 536 (3, c) (119 S.E. 723). In this case it appears that the jugular artery of the deceased had been severed, and that he died within a few minutes thereafter. The fact that the deceased might have asked for a doctor does not establish, and might not of itself be taken in the mind of the jury as in any way indicating, that the deceased was unaware of his dying condition, since it is but natural that even a dying man could wish to be attended by a physician. The fact that the deceased did not call the full name of the *Page 775 
defendant, but only the name "Henry," does not render this evidence inadmissible when taken in connection with the other evidence that there was no other person present at the time of the homicide with such name.
5. Under the evidence which has been recounted, including that of the eye-witnesses who testified that the defendant, while brandishing an open knife, followed the deceased who was backing away from another person into an adjoining room, the testimony as to the dying declarations of the decedent, and the testimony with reference to the admissions of the defendant that he did the cutting, the court did not err in failing to charge on the law of circumstantial evidence as related to a case depending solely on testimony of that character. Toliver v. State, 138 Ga. 138
(74 S.E. 1000).
6. The court did not err in failing to charge on the law of voluntary manslaughter with reference to a mutual intention to fight, since there was nothing in the evidence, nor even in the defendant's statement, to justify such an instruction. The evidence for the State raised no such question, and the statement of the defendant, denying any participation in the homicide, was wholly inconsistent with any such contention.
7. The court did not err in failing to charge, on its own motion, as to the law of assault with intent to murder or the law of stabbing. The argument of counsel in conformity with these grounds is that, since no witness followed the defendant, the decedent, and the other party who was backing the deceased into the other room, it was not known which of the two assailants inflicted the mortal wound; that, since the evidence does not warrant a finding of conspiracy between the two assailants, a conviction of murder would not be authorized; and that, therefore, the charge on assault with intent to murder and on stabbing should have been given by the court on its own motion. Counsel cites Walker v. State, 116 Ga. 537 (5) (42 S.E. 787, 67 L.R.A. 426), and Fudge
v. State, 148 Ga. 149 (1, 2) (95 S.E. 980). The Fudge
case merely lays down the well-recognized principle that where one, jointly indicted with another for murder, is on trial, if there be no evidence which would warrant a finding of conspiracy, and the person on trial did not inflict the mortal wound, a verdict of guilt is unauthorized. The case holds that the mere presence and participation of a defendant in the general transaction in which a homicide is committed is not conclusive evidence of conspiracy in the perpetration of the actual crime itself by another; but that whether or not there was in fact such a joint participation as amounted to a conspiracy, is to be determined by the jury under the facts and circumstances of the case. In Gower v. State, 166 Ga. 500 (3) (143 S.E. 593), the same Justice who prepared the Fudge case shows that "participation in the intent and the criminal act is essential to make one an accomplice," citing several cases. It is not necessary, in order to show joint concert of action, that a preliminary antecedent agreement should have been formulated. A joint concert of action, amounting to a conspiracy, may be shown by circumstantial as well as by direct evidence. See Georgia Digest, Vol. 5, page 688 (Conspiracy, § 47), citing numerous cases. Whether conspiracy *Page 776 
is in fact established is a question for the jury. In Hudgins v. State, 61 Ga. 182, it was held that, where it was shown that two men ran up behind a man and struck him, one of them using a deadly weapon, and ran off leaving him alone in darkness, the evidence was sufficient proof of conspiracy. See Code (Ann.), § 38-306, for numerous citations on this subject. Thus, where the defendant, brandishing an open knife, followed another person who was backing the unarmed decedent into another room where the decedent suffered five knife wounds, one of which severed his jugular artery, and where the dying declaration of the decedent could have been taken to indicate that the defendant did the killing, and the proved statement of the defendant admitted that he did the cutting, the evidence was sufficient to show both a concert of action between the two assailants and the infliction by the defendant of the mortal wound, and thus to charge the defendant with responsibility for the murder, even though there was no witness to the actual cutting, and though there might have been evidence that the other assailant later admitted having struck at the deceased with a knife, without knowing whether he hit him or not. The evidence thus authorizing the jury to believe that the two assailants were acting in concert, and that the defendant in fact inflicted the mortal wound, these grounds do not authorize setting the verdict aside for the reasons set forth in the motion.
8. Exception is taken because the court charged the jury as follows: "When a witness shall be successfully contradicted as to a material matter, his credit as to other matters shall be for the jury. But, if a witness shall swear wilfully and knowingly falsely, his testimony shall be disregarded entirely unless corroborated by circumstances or other unimpeached evidence. The credit to be given such witness' testimony, where impeached for contradictory statements, shall be for the jury to determine." Counsel contends that by the use of the word "such," which has been italicized in the quotation from the charge, the jury might have understood the court to refer to a witness who had sworn wilfully and knowingly falsely, and who had not been corroborated. This does not appear to be the natural and plainly expressed meaning of the excerpt, since what the court said was that "the credit to be given such witness' testimony, where impeached for contradictory statements, shall be for the jury to determine." The instruction is in substantial accord with the provisions of the Code, § 38-1806.
Judgment affirmed. All the Justices concur, except Head, J., disqualified.
 No. 15265. OCTOBER 3, 1945.
Henry Patterson and Mose Boyd were indicted, in the superior court of Jefferson County, Georgia, for the murder of Bill Johnson. Mose Boyd was not apprehended, and Henry Patterson was convicted with a recommendation of mercy and sentenced to life imprisonment. A motion for new trial was filed on the general *Page 777 
grounds and nine special grounds, which are dealt with in the syllabus. The evidence showed that Bill Johnson had been stabbed and cut five times on the body, arm, and neck, and that a cut which severed the jugular artery on the left side of the neck produced death, which according to the attending physician, would have resulted within fifteen or twenty minutes from the time of severance of the jugular artery. Eye-witnesses testified that Mose Boyd was riding in his automobile with Louise Givens and others, among whom was Henry Patterson, the defendant, whom Boyd left at Patterson's home near that of Louise Givins. Later they brought Louise Givins back to her home, and upon arriving there Bill Johnson, the deceased, was on the porch and Patterson was nearby. There was evidence that Johnson and Boyd were both going with Louise Givins and were rivals. After Louise Givins entered her house, Mose Boyd knocked on the door, and when she opened it he came in followed by Bill Johnson, Henry Patterson, and others. Boyd passed by her and Johnson then slapped her, whereupon, according to her testimony, Boyd and Johnson caught hold of her, one of them pulling her one way and the other pulling her the other way, and she tried to get them to go out; and, when she couldn't get them to go out, Henry Patterson "took up the argument, and when I looked around Mose and Bill was tied up fighting, and I see Henry go up to Mose and Bill, and he went up to them like that with a knife, and when I seed him go up to them like that I broke and run out of my back door. Henry Patterson is the one who had the knife. As to how he handled the knife, I just seed him come up with the knife like that (indicating, raising it). It was open." Eddie Hargrove testified: "I saw Bill walk up on the porch behind Louise after Louise went in the house, and Louise went in first and Bill Johnson went in behind Louise and Mose Boyd went in behind Bill, and Henry went in behind Mose Boyd, and I come in behind Henry and Robert come in behind me. We were not going in the house for any particular purpose. As to what happened after we got in the house, well, just as soon as they got in the house, me and Robert Heath wasn't exactly right with them, but we come in right behind them and as soon as he got in the house I heard Bill slap Louise. I didn't see him slap her, I just heard him slap her as I come in the door. As to how I know he slapped her, when *Page 778 
I come in the door I heard him slap her as I come in the door, I heard them fussing, and I got in the little door, and as soon as I walked in the house Bill he started to backing up, and Mose Boyd, he started on him. Mose Boyd started on Bill, and Bill, he was backing on up, and they backed up into the shed room. It was dark in there, in the shed room. In the front there was a light there, but in the back room it was dark. Mose Boyd was going on Bill and he was backing up, and Bill and Mose Boyd backed into the middle room, the dark room; and Henry Patterson, at that time he went into that room where the other two was, at the time that I saw Henry in there and at the time that I saw him going to that room, I did not see him with anything in his hand; I sure haven't seen him with anything. I haven't seen him with anything at any time during the time I was there, I didn't see but three that went into that room, Mose Boyd was going on Bill, and Bill was backing up in the room, and Mose Boyd was going on him, and after they got in there I heard the lumbering up kind of side of the house, against the side of the house. I did not go in there to see what was going on. I went out. I went out of the front door. . . Mose Boyd and Bill and Henry Patterson were in that room where the lumbering was going on." On cross-examination, he testified that when he left the scene he started down the road to his home and was overtaken by Mose Boyd, in his car, who picked up the witness, and they and Robert Heath went along together; that, when Mose Boyd picked him up; Boyd said: "I stabbed at him; I don't know whether I hit him or not because it was kind of in the dark." No witness testified that Mose Boyd was seen with a knife, and there was no testimony as to the actual cutting in the dark middle room. The witnesses all ran when the trouble started. Mary Queen testified: that on the night of the homicide Love (Moon) Mulling, who earlier that night had been with Bill Johnson on Louise Givins' porch, was at Mary Queen's home, the fourth house from Louise Givins' house, together with Bertha Lee Salem; that Bill Johnson knocked and was calling Moon Mulling, and came on into the house saying, "Moon, Moon, Henry, Henry," and told Moon to get the doctor; that "blood was coming out of his mouth and all over him from the looks to me, and he didn't stand up no time after he got down; after he got down he allowed Moon [to] get the doctor. Before he *Page 779 
mentioned about the doctor, he was saying, `Moon, Moon, Henry, Henry,' and after he got down to the floor he was lying flat on his back. He tried to get up, and he said `Moon get the doctor,' and he tried to say something else but what it was I don't know. . . The doctor didn't even get there; he did die right there on my floor." On cross-examination, she testified that, after she left the house, Henry Patterson came up behind her and Moon Mulling, and "he asked us who Bill said cut him." Bertha Salem also testified as to Bill Johnson's statement on entering Mary Queen's house, of "Moon, Moon, Henry, Henry," and that, when they were going up the street, Henry was walking behind Mary Queen and Mulling, and asked Mary Queen, "Who did Bill say cut him?" and she said, "Henry," and he said, "Thank you," and turned around. Love (Moon) Mulling testified that earlier on the night of the homicide he had gone with Bill Johnson to Mary Queen's house, and Bill left him there and came back about five minutes later, and Mary Queen heard him calling, "Moon, Moon," and opened the door, "and when the door opened Bill fell up in my arms and told me he was cut, and I asked him who cut him, and he said, `Henry.' . . I started to get the doctor . . and got to Louise's house . . and Henry popped up and he `lowed `you know who cut Bill?' and I says, `yes,' and he says, `who?' and I says . . `I will tell you when I get home,' and when I got up on the bank I says `you are the one that cut him,' and Henry says, `I know it, I know it,' and turned around."
There was evidence for the defendant, for the purpose of showing previous contradictory statements by Moon Mulling as to the dying declaration and the confession testified to by him. The defendant made a statement, in which he told of being at Louise Givins' house with the others at the time of the homicide, and that, when Bill Johnson slapped Louise Givins, Mose Boyd asked Bill what he kept slapping her for, "and Bill Johnson asked him what he had to do with it, and he said, `I got a heap,' and that time Bill Johnson made for his hip pocket, and Mose Boyd sailed on to him with his knife, but I didn't see Bill Johnson come out with nothing, and they got to fighting in there and went on into the other room, and so me and Eddie Hargrove and Robert Heath, we all run out, and they run out there and they got in the car, and so I run out there, and where Louise went I didn't see Louise; *Page 780 
I run over there and they got in the car, Mose Boyd, I don't know who drove the car off, but I know Eddie Hargrove and Robert Heath went out there and got in the car, and they say they picked him up down the road. I don't know whether he got in the car or not, but I know they run out there and got in the car, so the two boys, we went on down there where they were and after that we heard somebody `low down there he was cut. Love Mulling, somebody, `lowed down there Bill Johnson got cut to death, somebody done cut Bill Johnson about to death; and Love Mulling he come up there and says, `Who cut Bill, who cut Bill? You all know who cut Bill,' and I says, `Aint nobody cut him but Mose Boyd, they were in there fighting about Louise.' That is what I told him, and I went on down there where Bill Johnson was lying down on the floor and all of them, Shine and all of us went down there, and when us walked in there he asked about getting a doctor, and Shine said it was too late to go after the doctor, and I left and went down there to the next house where I stayed, and I stayed there until Mr.---- and the sheriff come down there, and as far as having anything to do with it, I didn't have nothing to do with it. I was in there, but I didn't do nothing to him." In a supplemental statement, the defendant said, "I did not have any conversation with Love Mulling after this fight."