INGRAM *v.* THE STATE (three cases).

Nos. 16263, 16264, 16265. JULY 13, 1948. REHEARING DENIED JULY 28, 1948.

A. T. *Walden* and *Edward R. Dudley,* for plaintiffs in error.

*Eugene Cook, Attorney-General, E. L. Forrester, Solicitor-General,* and *Rubye G. Jackson,* contra.

Wyatt, Justice. The statement of facts comprehensively· details the evidence in this case, and we shall not go into an extended discussion of it in this opinion. However, it is difficult, from the testimony alone, to fully comprehend the nature of the State's case, and some explanations appear in order.

A number of photographs, many times referred to by the witnesses, were introduced in evidence. These photographs, together with the testimony of witnesses, tended to show the following: The home of the defendants was located almost due south, and perhaps a half mile from, the home of the deceased. A dirt road led from the Ingram home to the Stratford home. On the east side of this road there was a field enclosed by a fence. On the west side there was an unenclosed cotton patch and a small tool house situated near the road in the cotton patch, and between the two homes. The scene of the first struggle, referred to in the testimony, was on or near this road. The second struggle referred to occurred further north on or near the road and nearer the Stratford home, about 141 steps from the scene of the first struggle. In the cotton patch, about 75 feet southwest of the scene of the last struggle and the location of the body of the deceased, there were physical signs indicating that someone had been sitting, lying down, or wallowing there;

and wide-spaced tracks led from this point to the scene of the last struggle.

The State's evidence tended to show two struggles or encountors, as above described. There was testimony as to tracks made by the deceased and tracks made by others in work shoes, indicating a struggle and that the deceased had then run to the point where the second struggle occurred; and that he had been pursued and overtaken by someone, as indicated by wide-spaced tracks. There was testimony showing signs of drops of blood leading to the body from a point about two hundred yards south of the location of the body.

Mainly the State's case rested upon incriminatory statements made by all three of the defendants and circumstantial evidence fully corroborating these statements. The State's evidence tended to show, and the jury were fully authorized to find, that after an argument about the mules, the deceased went to get his rifle, and the defendants went to get the stock out of the deceased's field; that afterwards the deceased returned with his rifle, met the defendant Rosa Lee Ingram, and a quarrel ensued; that the deceased struck the defendant Rosa Lee Ingram and a fight followed, with Rosa Lee Ingram getting the gun away from the deceased; that the deceased broke away from Rosa Lee Ingram and started running toward his home; that Charlie and Wallace Ingram ran and headed off the deceased, who was unarmed; that the deceased, after running more than a hundred yards, turned and began running in the opposite direction, seeking to escape; that he was caught by Rosa Lee Ingram, who had pursued him, the other defendants came up, and all three of the defendants struck and beat the deceased, using a claw hammer, a hoe, and a rifle; that, during this last encounter, while the defendants were beating the deceased, one of the defendants had time to go about seventy-five feet and get a claw hammer and a hoe and return to the scene of the struggle, and these implements were used by the defendants in beating the deceased; that the mortal blow was struck the deceased at the scene of this last struggle, while he was unarmed and while he was prostrate on the ground.

Undoubtedly the jury were authorized to find that the defendants, after the deceased had completely desisted from all efforts

to fight, took concerted action in running him down and administering to him a fatal beating, using means and methods wholly unreasonable and unnecessary to repel any attack that the deceased might have made.

We might note that all the defendants made inculpatory statements. Whether the statements were plenary confessions is unnecessary to decide, for some of the statements made by the defendants were clearly of such an incriminating character as, when taken in connection with the other evidence in the case, to authorize the jury to find that all the defendants participated in a felonious homicide. And we might note that these statements were fully corroborated by other evidence, while the statements made by the defendants to the jury were irreconcilable with the physical evidence, including the evidence as to tracks and struggles as well as the evidence of at least five separate wounds on the head of the deceased.

The distinction between voluntary manslaughter and murder is clearly stated by our Code § 26-1007, which provides: "In all cases of voluntary manslaughter, there must be some actual assault upon the person killing, or an attempt by the person killed to commit a serious personal injury on the person killing, or other equivalent circumstances to justify the excitement of passion, and to exclude all idea of deliberation or malice, either express or implied. Provocation by words, threats, menaces, or contemptuous gestures shall in no case be sufficient to free the person killing from the guilt and crime of murder. The killing must be the result of that sudden, violent impulse of passion supposed to be irresistible; for if there should have been an interval between the assault or provocation given and the homicide, of which the jury in all cases shall be the judges, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge, and be punished as murder."

In the instant case, whether the interval between the time when the first encounter occurred and the deceased freed himself and sought to flee and the second encounter, during which he was killed by a severe beating, was a sufficient cooling time to make the offense murder, was a question which the law placed exclusively upon the jury for determination. The law pre-

scribes no particular length of time which might be considered sufficient cooling time, and we might cite many cases where the interval between an initial encounter or provocation and the fatal blow or shot was much shorter than that shown in the instant case. For instance, in *Napper* v. *State*, 200 *Ga.* 626 (38 S. E. 2d, 269), the accused sought to gain his liberty from an illegal arrest, as he had a right to do. He knocked the arresting officer down, and then immediately shot the officer while he was lying on the ground. A conviction of murder was upheld, this court holding: "There was certainly a lapse of time between the time when the accused freed himself from the arrest by the policeman and the fatal shooting by the defendant, and under the law it was the exclusive duty of the jury to say whether or not this interval was sufficient for the voice of reason and humanity to be heard. If so, the law would attribute the slaying to deliberate revenge, and the slayer would be guilty of murder." The writer of this opinion was a lone dissenter in that case, but is forced to the conclusion that the facts in the instant case establish a much stronger case, and one clearly bringing the case within the definition of murder as distinguished from voluntary manslaughter. In *White* v. *State*, 118 *Ga.* 787 (45 S. E. 595), this court held: "Although the parties had engaged in a struggle, and there was evidence from which it might have been inferred that the deceased, who was unarmed, was the assailant, yet where it appeared that he retired, declining further contest, and that the defendant, with an open knife in his hand, pursued the deceased, and inflicted five wounds, one of which proved fatal, the evidence was sufficient to warrant a verdict of guilty of murder. . . The fight, pursuit, number of wounds, and the attendant circumstances were amply sufficient to justify the jury in finding the defendant guilty of murder. . . It was for them to say whether the interval between the assault and the homicide was sufficient cooling time to permit the voice of reason and humanity to be heard." See also *Dennis* v. *State*, 184 *Ga.* 838 (193 S. E. 887).

We are constrained to hold that the jury were authorized to find that there was a sufficient cooling time for the voice of reason and humanity to be heard, and to attribute the slaying to deliberate revenge.

Whether or not the defendants acted with a common intent and purpose in a concerted action to make the attack upon the deceased, was a question for determination by the jury, and there was sufficient proof offered to authorize the jury to find such to be a fact. A conspiracy may be proved by conduct as well as by an express agreement; and it is unnecessary that any antecedent agreement or understanding between the alleged conspirators be shown. If the evidence shows, and in this case it was sufficient to do so, that the defendants. acted with a common intent and purpose in the attack on the deceased, and that the things which were proved to have happened were within the scope of this common intent and purpose, this amounts to a conspiracy. Such being true, the act of one within the scope of the conspiracy and during its progress was the act of all. See *Patterson* v. *State*, 199 *Ga.* 775 (7) (35 S. E. 2d, 504) ; *Simmons* v. *State*, 196 *Ga.* 395 (26 S. E. 2d, 785) ; *Screws* v. *State*, 188 *Ga.* 678 (2) (4 S. E. 2d, 601) ; *McCormick* v. *State*, 176 *Ga.* 21 (2) (166 S. E. 2d, 762) ; *Wells* v. *State*, 72 *Ga. App.* 201 (1) (33 S. E. 2d, 563).

We are not unmindful of the principle of law, as embodied in our Code § 26-1015, that "Parents and children may mutually protect each other, and justify the defense of the person or reputation of each other." This principle of law, however, does not afford a basis for justification of a homicide upon facts showing that the danger to the relative was not impending. *Kitchens* v. *State*, 143 *Ga.* 290 (1) (84 S. E. 966). As stated in *Daniels* v. *State*, 162 *Ga.* 367 (2b) (133 S. E. 866): "To kill with any degree of deliberation, when no considerable provocation is given to the slayer by the deceased at the time, not for the purpose of preventing any impending wrong, but for the purpose of avenging a past wrong, is murder." In *Osgood* v. *State*, 63 *Ga.* 791, 793 (3), the court, in upholding a conviction of murder, said: "It is true that a whole family was involved in the fight with deceased, and that the defendant, rushed into help his father and kindred (Code, § 1796), and that the facts show a great riot, and that deceased went to the home of the father of the defendant. Nevertheless the facts show that this defendant struck deceased when he was down, and that he and his sister, Ellen Osgood, both inflicted unnecessary blows upon a man

184

prostrate and unable to defend himself; and from those blows with clubs and hoes the physician testified that the deceased died. The evidence is sufficient to support the verdict."

While our conclusions in this case might have been different had the State's evidence shown one encounter, with the children of Rosa Lee Ingram coming to the aid and protection of their mother, and the killing then occurring while the parties were engaged in fighting, we are not called upon to decide this question. The evidence tending to show one encounter, the deceased desisting from further efforts to fight and attempting to flee, pursuit by the accused, and the subsequent overtaking of the deceased and the infliction of mortal blows by the accused in a second encounter, the jury were confronted with this proposition: the accused would be guilty of murder or voluntary manslaughter as the jury might find the homicide to have been committed from motives of revenge or as the result of passion.

In passing on the general grounds of a motion for new trial, this court passes not on the weight but on the sufficiency of the evidence. It is our duty to determine whether the verdict as rendered can be sustained under any reasonable view taken of the proofs submitted to the jury. We are not called upon to say whether, had we been in the place of the jury, we might have found the accused guilty of a lesser offense. It was the province of the jury, and theirs alone, to put their appraisal upon the proofs submitted to them. Accordingly, the judgment must be

*Affirmed. Jenkins, Chief Justice, Duckworth, Presiding Justice, Atkinson, Head, and Candler, Justices, and Judge Lilly concur.*