The evidence was sufficient to support the verdict of the jury finding the accused guilty of murder.
 Nos. 16263, 16264, 16265. JULY 13, 1948. REHEARING DENIED JULY 28, 1948.
Rosa Lee Ingram, Charlie Ingram, Wallace Ingram, and Sammie Lee Ingram were jointly indicted for murder, the indictment *Page 165 
charging that they killed and murdered John Ethron Stratford in Schley County on November 4, 1947, by hitting, striking, and beating the said Stratford in and on his body with a certain rifle, hoe, and claw hammer. The accused, Rosa Lee Ingram, Wallace Ingram, and Sammie Lee Ingram were tried together. The jury returned a verdict of guilty of murder without a recommendation. Each of the accused filed a motion for new trial on the general grounds only. The trial court commuted the sentences to life imprisonment, and overruled the motions for new trial. To this judgment, overruling the motions for new trial, the accused excepted.
The State's evidence was as follows: Mrs. Irene Stratford, wife of the deceased, testified that the deceased on the day of his death weighed 130 pounds, his age was sixty-six, and "he was not strong, he was weak;" that she and her husband lived on Mr. C. M. Dillinger's place in Schley County, and her husband was a share cropper for Dillinger, as were the four defendants, who lived on the same place on a farm joining the farm on which the deceased resided; that the dwelling house in which the Ingrams lived was located in Sumter County; that on the morning of November 4, 1947, she saw some mules in her husband's filed; that she saw a gray mule, belonging to the Ingrams, in a cornfield south of the house; that she saw her husband come to the house, get a rifle, and leave with the rifle, going towards the cornfield; that she never again saw her husband alive; that the last time she saw her husband alive he was going with the rifle around a small tool house.
The witness then identified certain photographs. The first (introduced by the State as Exhibit 1) showed a small wooden house with a dirt road leading by the house. About fifty or seventy-five feet from the house, there was shown a hat lying in one rut and a satchel lying in the other rut of the road. She testified that this house, shown in the photograph, was the tool house around which she last saw her husband walking alive; that she later found her husband's body near the tool house, and the hat and satchel in the photograph represented where her husband's body was lying on its back with the head east and the feet west. The witness further testified that when her husband left with a rifle he did not say anything, "only said he was *Page 166 
going to kill the stock;" that this was about 9:30 in the morning and around 11:30 she went to the mail box and returned, without having heard any shot, and after she returned from the mail box, she met Jackson, Charlie, and Wallace Ingram; that Jackson Ingram freely and voluntarily made a statement to her; that "Jackson Ingram asked me in the presence of Charlie and Wallace Ingram if I knew Mr. Stratford had shot Mama, and I told him I did not know anything about it; he says, `Well, he shot her and she needs to go to the doctor and we have not got any money.' I says, `Well, he asked her to keep the stock off of him and she would not do it,' and he says, `Well, he is done now.' I says, `Well, where is he at,' and he says, `Up there in the field dead.' He said he would show me where he was at, and I went in the house to see about the fire in the stove and all three of them run." She further testified that she hunted for the body and could not find it, and then went to Rosa Lee Ingram's house and called, and nobody would answer, but finally one of the boys came out and told her where to find the body on the road leading to the tool house; that she found the body lying in Schley County and went to get somebody to go to Americus to notify officers. The witness identified a rifle and knife as belonging to her husband, but stated that a claw hammer and metal hoe shown to her did not belong to her husband.
Bob Carswell, after recounting that he heard a report that the deceased was dead and went to look for the body, testified: "He was laying there across the road. . . That body was in Schley County laying on its back; his head was laying to the east and his feet to the west. He had his right arm stretched out and the blood had run down clear to his hands. His head was right in the edge of the weeds. He was really dead. After I saw he was dead I did not make any examination of the premises around there. I noticed where they scuffled around in the edge of the cotton patch; there were shoe tracks and some rubber boot tracks there. The way I could tell that track from the others was because it was ridged on the bottom. Those other tracks I saw looked like shoe tracks. I could not tell whether men's tracks or women's tracks; they were all around there where that took place."
S.E. McGowan Jr., an embalmer, testified that he examined *Page 167 
the body of the deceased and saw five wounds where the skin was broken. He identified a photograph of the deceased (showing the side of the head), and testified that two probes shown in the back of the deceased's head in the photograph represented wounds which penetrated the skull, and a third wound shown with scissors did not penetrate the skull. He testified that there were five separate wounds on the back of the head.
Clark Williamson testified (after identifying a picture showing the location of the body and a picture of the body) that the pictures represented where the body lay when he arrived, and the picture of the back of the deceased's head showed wounds similar to the wounds he saw. He then testified: "When I went out there and saw that body, I saw something out there a few feet from where the body lay, southwest from where the body was laying about fifty or seventy-five feet in this cotton patch, somebody had either been sitting down or kneeling down or wallowing around there. . . Out here it looked like somebody had been sitting down or wallowing around." The witness further testified that he talked to the defendants separately, and they made statements to him which were freely and voluntarily given. He testified: "Rosa Lee told me she took that gun away from Mr. Stratford and hit him over the head. She did not tell me why. She said she hit him over the head and knocked him down, and he tried to get up, and she knocked him down again. That is about all she said. She talked like she hit him and knocked him down, and he tried to get up, and she knocked him back down. She did not say whether anybody else hit him or not. Charlie and Wallace said they did not do anything. I took them in the presence of their mother then. They backed their mother up there — that all the licks that were passed were two licks that Rosa Lee herself hit him with the rifle. The hammer was not mentioned. Nobody said anything about who struck him with the hoe. . . Wallace and Charlie said they came to see what the trouble was, but said they did nothing. Sammie Lee did not know anything either. He did not do anything. I would judge that Mr. Stratford had very little blood in him when I got there. Where his head was lying there is a little bit down grade in that trench and blood had puddled and run down in the direction of his little house." *Page 168 
R. N. Chapman, Coroner of Schley County, testified that he went to the scene of the homicide and made an investigation; that he found the body of the deceased lying in a field road leading from the Stratford house to the Ingram house; that the body was a good quarter of a mile from the Ingram house. He further testified: "John Ethron Stratford had on a pair of rubber boots. I made some examination of the ground and premises around where that body lay. I did not find a knife, gun, stick, pistol, or any weapon laying by the body of Mr. Stratford. . . I saw some tracks just to the right going from where the dead body was lying, maybe two cotton rows from where the man's body was lying, and I noticed from the signs of the tracks one of them was the rubber boot that the man had on. It was west of where the body was. . . I saw some blood there; there was blood running from where the dead body was off back that way, I would call it north some four or five feet. . . After I examined the body I then went towards the Ingram house and there was tracks of blood I would say something like two hundred yards from where the dead body was, going in the direction of the Ingram home. The blood was heavier by the body and the farther away I got the lighter it got on the ground. . . I would say around fifteen steps or something like that from where the dead body was, the ground was not messed up, only looked like somebody had been sitting on it. From what I saw there I would say it was some human sitting there on the grass." The witness then testified that Rosa Lee Ingram made a free and voluntary statement, stating that she killed the deceased; that "she said she took the barrel of the gun and struck the man twice over the head."
W. T. Beauchamp, of the Georgia Highway Patrol, testified that he, accompanied by Trooper Britt, made an investigation of the homicide; that they found the body in a little field road. The witness identified photographs numbered one to six, and testified as to their correctness, stating that he participated in making them. With reference to photograph No. 1 (Exhibit 1), he testified: "In this picture the bag represents the position of Mr. John Ethron Stratford's head and shoulders and my hat here represents where his feet were lying. Where I am standing there (about five feet from the location of the body) is where *Page 169 
we found tracks in the field where the ground was scuffed up. We came to the conclusion that a struggle had taken place. Where I am standing in this photograph I found a red button which later developed came off the sweater of Rosa Lee Ingram, one of the defendants. This house is a house which was used at that time apparently for a tool shed, some plow points and different farm implements were there; that is north of where the body lay. . . Photograph No. 2 shows the distance between where two alleged struggles took place. Down where you see a person standing there is where the first one took place, and where the bag is, is where the second one took place. The first scene is south of where the body was lying. You can see the house Rosa Lee Ingram was living in at the time in the picture. I don't have the figures on how far it is from where the body was lying to where an alleged scene of something took place. From having seen it I would say it was somewhere in the neighborhood of 141 steps. . . I went to the home of Rosa Lee Ingram south of where the body was found; I saw Rosa Lee Ingram and her boys at the home. . . When I entered the gate, just to the left of what I call the driveway, we observed a short-handled hoe and a short-handled claw hammer lying there in plain view." The witness then testified that he questioned the defendants, and they freely and voluntarily made statements to him, each of them making the same statement to the effect that Rosa Lee Ingram killed the deceased. He testified: "Rosa Lee told me that they had had some trouble over mules getting into the crop, and Mr. Stratford had come to the field where she was working that day with her boys and they had some words about it. I don't remember exactly what words were exchanged, but Mr. Stratford told her he was going to the house and get his rifle and shoot those mules if they did not get them out of his corn. And when he came back they met there in the road and Mr. Stratford cursed at her; and then he pointed that gun at her and shot her right between the eyes, and she then took the gun away from him and knocked him down the first time with the rifle, and he got up and she hit him again and knocked him down. She showed me how she drew the rifle back over her right shoulder and hit him and knocked him down. I says, `How did you do it the second *Page 170 
time?' and she said the same way, hit him with the stock. She told me the killing occurred right there where we found the body, shown in the picture No. 1, where the satchel indicates where the head of Mr. Stratford was and the hat where the feet were. . . Rosa Lee Ingram had a head rag with a blood stain tied around her forehead, and I lifted the head rag off and found just a small nick on the skin there which had bled some and there was a bump, what I call a goose egg. I told her I could not see where she had been shot, there was no entry made there, and I examined the gun and there was not any smell of powder in the chamber of the gun, and I told her the gun had not been fired; and she said it sounded like a shot to me and I felt like I was shot. There was no bullet wound there. . . When we left the first time we took no one with us except Rosa Lee and James Frank. . . I looked for that hoe and hammer on the second trip. We asked Wallace and Charlie, they were the two older boys, where it was and one of them told us, said somebody had carried the hoe into the house. Trooper Britt got the hoe out of the house. . . When he came back I found the hammer over in the weeds behind where the sheriff is standing there. . . I made an examination of the hoe when I got there that day; the hoe was clean, very clean at that time, and in looking on the blade of the hoe I found what appeared to be a gray hair on the blade of the hoe. From having seen the body of John Ethron Stratford, I noticed his hair, his hair was gray, the strand of hair I saw on the blade of that hoe and the hair of John Ethron Stratford were both the same color. When I got the hammer I found one small spot on the jaw of the hammer which appeared to be blood. I could not testify it was blood but it was a crimson color, dried. Both the hoe and hammer were clean. . . Rosa Lee told me at the scene of the murder that this hoe had been up in the field ever since they had chopped cotton. She told me that on November 4, the day I was there. When I saw the hoe it was perfectly clean at the time we first found it." The witness then described various wounds he saw on the body of the deceased, including a laceration over the eye about three inches long, and two puncture wounds on the back of the head, and testified: "I observed the surroundings where the body was laying around about twelve or more feet. *Page 171 
There was a number of tracks made around there which appeared to be made by people scuffling; and I found two distinct sets of tracks, one made by someone wearing a rubber boot. The body of Mr. Stratford had on rubber boots that day. I saw the tracks made by rubber boots beyond number one, just this side of where I am standing there, south of where I am standing, a set of tracks made by the rubber boots were facing in a northerly direction, and a set of other tracks facing them made by someone wearing large shoes, I would say work shoes, facing the tracks wearing rubber boots. Both of them were deeply imprinted in the soil, as the soil was soft, firm imprints on the ground. The work shoes were facing in a southerly direction towards the Ingram home. The rubber boots were facing in the general direction of the Stratford home, not directly, but in a northerly direction. I noticed the shoes that Rosa Lee, Charlie Wallace and Sammie Lee had on that day. They all had on work shoes, and in my opinion they were all about the same size. They were all large, looked to be men's shoes. That was true of Rosa Lee and all the boys. The smaller ones even had on a large pair of work shoes."
L. S. Boyette, a physician who examined the body of the deceased, testified: "I saw several wounds on that body; on the left side of the head up here about the center in this region of the parietal bone there was a bruise about two inches in size. . . The wound I am talking about is entirely different to those shown in that picture No. 7. . . Right here is a laceration about two inches in length up above the temple in the hair and it goes down to the skull. Back here in this region where you see these three probes sticking in there, that circle is two inches in diameter, there is a probe sticking down through the skull here and one sticking through the skull here. This center one went down through the skin to the skull but did not go through, but these probes slipped down through the skull into the brain. I have had experience during the time I have been a practicing physician and surgeon to observe a lot of types of injuries such as those made with a hammer or hoe or rifle or other blunt instrument. From having observed those wounds I took that wound which does not appear in the photograph, which was on the left parietal bone of Mr. Stratford's head, to be made by a blunt *Page 172 
instrument. . . All I can say is a blunt instrument, a hoe handle, a rifle barrel or the stock could have done it, but it was not anything sharp that struck through the skin. . . The only thing I can say is a sharp instrument made those two wounds in the back of the head and two of them were long enough to go down through the skull. It was sharp and narrow. Two of those wounds back here were three quarters of an inch in length and one of them half an inch in length. I looked at his head that night and figured out how the lick would have been dealt with this claw hammer and I think that it could. . . After going and looking over his whole body and getting all the information I could I decided two of those holes in the back of his head that admitted the probe down in the brain stem were sufficient to cause death. They usually die quick from an injury in that region, almost immediately. My opinion is that one or two of those wounds that went down into the brain stem was the primary cause of his death." The witness then testified that he examined Rosa Lee Ingram, "stripped her down," so he could examine her chest and shoulders, and found nothing except a bruise about two inches in diameter with an abrasion in the center of it, which was located between the eyebrow and hair line on her forehead, and as to this injury, he testified: "I think that injury was made as the result of just one blow. I would not think you would hardly hit exactly in the same spot twice. If it had been two blows I would say it had to be hit twice in the same place. I think the butt end of that knife unopened could make the injury; if you use the edge of this rifle it could make the injury; if you did not use the edge or flange or this butt here, the chances are that would not do it. I would think she only had one injury."
J. E. DeVane, Sheriff of Schley County, testified as to making an investigation, identified Exhibit No. 1 as representing the place where the body was found, and then testified: "I noticed the ground and conditions there. I saw the ground had been pawed up and scuffling apparently had been done there. After I saw that I noticed what kind of shoes Mr. John Ethron Stratford had on. He had on some rubber boots; those boots were ridged on the bottom. . . I saw some tracks out there by where that body was. I saw a number of tracks all around *Page 173 
where the body was lying; some of those tracks were deep and some were in light; some of them were apparently on the toes and some were sliding like they might have been pushed, but lots of them were on their toes, were not more than ten or twelve feet from where the dead body of Stratford lay. It was to the southwest of the body in the edge of a cotton patch of Mr. Stratford's located in Schley County. I saw some other tracks. I was looking all around where the body was and saw his track coming through the cotton patch widely spaced about five or six feet. Those tracks were made with good-size men's shoes. Those tracks led from the cotton patch to the body. One set of tracks did that, and after I found that set I found another set that went just around that body. . . I examined all around the edge of this cotton patch and found these tracks leading in from this cotton patch southwest of the body, coming from this cotton field; one went directly to the body and one set went around the body. When I say went directly to the body, I mean it went where I saw the scuffling. That looked like a man's track, I would say a number nine work shoe. The other set of tracks were widely spaced and came along here together about eight feet apart, and the other set turned and went farther around, farther north than the first set. That man in photograph 3, standing there with a dark suit on is Sheriff McArthur. He is representing the first place that the ground was pawed up. There was another place above where the body was all sluffed up and the ground pawed up. I found some footprints there, a lot of them. Mr. McArthur is standing there at that point. Where Jack McArthur is standing, where I saw the first scuffed-up place, is 141 steps closer to the home of Rosa Lee Ingram and these boys than the place where the body was. I stepped it. That first scuffling was 476 steps from the home of Rosa Lee Ingram, over a quarter of a mile. I saw no indication of any ground scuffed up or anything that was not at least a quarter of a mile from the home of Rosa Lee Ingram."
The witness then testified that he questioned the defendants, and they freely and voluntarily made statements to him; that Rosa Lee Ingram stated that the deceased went to the cornfield where the Ingrams were pulling corn and told them to get the mules out of the cornfield; that the deceased stated he was *Page 174 
going to get his gun and shoot the mules if they did not get them out of the field; that Charlie and Wallace went to get the mules out of the field and she went to see about the pigs in the cornfield; that she came back and met the deceased. The witness then testified: "She met Mr. Stratford down there and he cursed her; she did not say what he said, but just said he cursed her and shot her, and I asked her where he shot her, and she said in the head, and I looked at the place; and she told me she grabbed him and he dropped the rifle and she hit him with it twice and showed me how she hit him. Where I saw the first scuffled-up ground, which was closest to the home of Rosa Lee Ingram, was in Schley County. From the place I saw the first sign of scuffled-up ground and up to the next place which was 141 steps further north, all that was in Schley County; every particle of it I saw was in Schley County, Georgia. . . After I saw the wounds in the back of Mr. Stratford's head, I compared the claws of that hammer with them. There were two wounds in the back of his head close together, two narrow instruments went into the skull; they were about half an inch apart and about half an inch wide, similar to the claws of this hammer." The witness then testified that he put the defendants in separate jails, and they made free and voluntary statements; that Sammie Lee Ingram was the first to make a statement. The witness testified: "He (Sammie Lee) made a second statement on December 8 last year at Oglethorpe, Macon County, Georgia. It was freely and voluntarily made. I threatened him in no manner and offered him no inducement whatever. I did not put him in the slightest or remotest fear of injury. I have what he said here. He said they were over in the cornfield pulling corn, Charlie, Wallace, Rosa Lee and Sammie Lee, and Mr. Stratford come there and told them to get the mules out of the filed or he was going to shoot the mules, and Rosa Lee told him he had better not shoot them, they belonged to Mr. Dillinger. Rosa Lee told him not to come over there raising sand, told Mr. Stratford that, and he had better not shoot the mules, but Mr. Stratford went back towards the house and got his rifle. . . Charlie and Wallace went and got the mules, and Rosa Lee went by the cotton patch to see about the pigs and Rosa Lee met Mr. Stratford. Sammie Lee came up on his bicycle in the road, and *Page 175 
Mr. Stratford said something to Rosa Lee about the boy opening her mail, after talking to her about getting the hogs out, and she called him a lie, said the boys did not open the mail, and he walked on down to the road where she was and started to fight, walked up with the gun and Rosa Lee grabbed him, and Mr. Stratford dropped the gun and Sammie Lee said he picked it up and kept it and said she started to hollering while she and Mr. Stratford were tussling, and Mr. Stratford got away from her and ran towards his home in a northerly direction. He said Rosa Lee was calling Charlie, Wallace and Sammie Lee, said Mr. Stratford got away from her and ran towards his home in a northerly direction. Mr. Stratford's home was north of the scene of the first scuffle, and Rosa Lee hollered for Charlie and Wallace, and they come running and ran faster than Mr. Stratford did and headed him off and caught him, and Sammie Lee said that Rosa Lee was following him on up the road, and after Mr. Stratford saw Charlie and Wallace had him headed off, he turned around and come back toward Rosa Lee; and Rosa Lee grabbed him, and Sammie said he hit him with the hammer twice, and Charlie hit him with the hoe once, and Rosa Lee hit him with the hoe once, and Wallace hit him with the rifle once."
The witness then testified that Wallace Ingram made a statement on November 29, which was freely and voluntarily given without hope of reward or fear of injury. The witness testified: "Wallace said Mr. Stratford came in the cornfield on that morning of November 4 and told Rosa Lee to get the mules out of his corn or he was going to shoot the mules, and Wallace and Charlie went to get them out and Rosa Lee went to see about the pigs. I have that statement he made. He said Rosa Lee said Mr. Stratford cursed her, but Wallace did not hear any cursing, and Mr. Stratford went back to the house to get the rifle while they went to get the mules, and he come back to his field and met Rosa Lee about the edge of his cotton patch, and Wallace and Charlie had caught the mules, and Rosa Lee and Mr. Stratford got to fighting and she began to holler, and Charlie and Wallace come running back up there and said Sammie Lee had the gun, said he took it after Mr. Stratford dropped it on the ground, and said Mr. Stratford got away and run north towards his house, and Charlie and Wallace ran around him and *Page 176 
headed him off; and instead of Mr. Stratford meeting Charlie and Wallace, he turned around and met Rosa Lee and she grabbed him, and Wallace said Sammie Lee gave him the rifle and he hit him one time with the rifle. He said Mr. Stratford and Rosa Lee were fighting when he hit him with the rifle. He said they were fighting with their fists. He said he hit him right on the back side of his head there. He said he turned loose and fell to the ground. He said Rosa Lee hit him with the hoe. He said he hit him the first lick. He said Charlie hit him with the hoe next, said Sammie Lee went to the tool house and got it up there above where Mr. Stratford was. He said Charlie met Sammie Lee and took it out of his hand and come back and hit Mr. Stratford in the head with it. He said Rosa Lee was holding Mr. Stratford then, had kind of lay down. He said Sammie Lee hit him with the hammer twice, and Rosa Lee hit him with the hoe. Charlie, he said, hit him with the hoe and Rosa Lee with the rifle. He said Mr. Stratford was lying on the ground when Rosa Lee hit him with the rifle. After the trouble there, he said Charlie carried Rosa Lee home and Wallace had the rifle and picked up the knife unopened on the ground and carried it to his house and put it on the mantelpiece. He said Sammie Lee carried the hoe and hammer."
The witness then testified that on December 8, 1947, in the presence of the solicitor, Sheriff McArthur, Sammie Lee Ingram, and James Frank Ingram, he had a further conversation with Rosa Lee Ingram at Perry, Georgia, at night; that she made a free and voluntary statement. According to the witness, at that time she gave the following account of the homicide: "Rosa Lee first denied it and said she killed him, but finally admitted that Charlie and Wallace and Sammie Lee did help her hold him and hit him. When she told it wrong, Sammie Lee and James Frank told her she was telling it wrong. She said what James Frank and Sammie Lee said was true. They said they were over there pulling corn and Mr. Stratford came over there and told Rosa Lee they must go to get the mules out of his corn, and Rosa Lee and Charlie and Wallace went to get them and Mr. Stratford first went by to get his rifle, said he was going to kill the mules if they did not get them out, and he got his rifle and come back to his cornfield. And Rosa Lee came along the road *Page 177 
there and Charlie and Wallace had the mules going towards the barn, and James Frank and Sammie Lee got on the bicycle and came along the road by where Rosa Lee was standing, and Rosa Lee told Mr. Stratford if he wanted to whip her there she was, to come on down and do it. She said then she just turned herself around to him and said there it was, to come on whip her if he wanted to, and Mr. Stratford walked on down where Rosa Lee was and Rosa Lee grabbed him . . and Mr. Stratford dropped the rifle and Sammie Lee took it, and Rosa Lee got to hollering for help, and Charlie and Wallace come across the field, and Mr. Stratford got loose from Rosa Lee and started to his home, and Charlie and Wallace ran around him and headed him off, and he saw them and turned around and met Rosa Lee and she grabbed him again, and Wallace hit him with the rifle, and Sammie Lee hit him with the hammer, and she said she hit him with the rifle. She said Charlie hit him with the hoe. She said Mr. Stratford was beating her with his fist when she hit him with the rifle. She said Wallace hit the first lick. She said Mr. Stratford had hold of her fighting her with his fist when Wallace hit him. She said Charlie hit him next with the hoe, said Mr. Stratford was still fighting at her then. She said Sammie Lee hit him next with the hammer. She said she was holding him up when he hit him. He was not doing anything. She said she hit him last on the ground lying down."
Sheriff Jack McArthur of Sumter County testified at length, corroborating all of the details of the statements of Sammie Lee Ingram and Rosa Lee Ingram as related in the testimony of Sheriff DeVane. The only slight differences in the statements were in the following details, as related by Sheriff McArthur. As to Sammie Lee Ingram's statement: "He said he gave the gun to Wallace and Wallace hit Mr. Stratford over the head with it, and in the meantime Charlie told Sammie to get the hoe out of the little house up there, and Charlie met him a piece of the way between there and the house and came back and hit Mr. Stratford with the hoe. Sammie said he got the hoe out of the tool house and he went on down there and hit Mr. Stratford twice with a claw hammer, and his mother hit Mr. Stratford one time with the hoe after he was down on the ground. He said Mr. Stratford was down when he hit him with *Page 178 
the claw hammer. He said Mr. Stratford was tied up with Rosa Lee when Wallace hit him the first lick with the rifle. He said Mr. Stratford hit his mother one time with the knife closed up in his hand." As to the statement of Rosa Lee Ingram, the witness stated that, after she had first denied that anybody hit the deceased except herself, and after she had been shown pictures of the deceased, showing the wounds on his head, and after her son, James Frank, had said, "Mamma, why don't you tell the truth?" Rosa Lee Ingram said: "She and Stratford were tussling when Wallace hit him with the gun and that like to have knocked him down, and they were tied up, and at that time Charlie hit him with the hoe and he went to the ground, and she got the hoe from Charlie, and in the meantime Sammie hit him with the hammer while he was down on his back, and she hit him with the hoe, which was the last lick."
The three defendants made statements to the jury. Rosa Lee Ingram, after relating the details of the argument about the mules, and after stating that the deceased said, "I am going to kill the negroes this morning," and after stating that he pointed the gun at her and cursed her, stated that the deceased hit her several times with the gun and with a knife. She stated that she took the gun away from the deceased, struck at him twice but only hit him once; that Wallace came up, took the gun "and hit Mr. Stratford and Mr. Stratford fell." She denied that anybody else hit the deceased. She stated: "My children have told these men a lie. I did not hit that man with a hoe and I would not have let them hit him with no hoe. That hoe was at my house. That hoe was not left in the field at all because, when I got through with the hoes when we chopped cotton, I thought I carried all of the hoes to the house. That is just the way that was done. . . Some said I held Mr. Stratford, but how could I hold Mr. Stratford; he was a strong man, not a weak man. I did not think he ought to have said anything to me after he come to the field and told me, looked like that would have been enough, but when I come over there, Mr. Stratford come out on me with that gun and that is just the way that was; that is all I have to say."
Sammie Lee Ingram stated: "Mamma asked him did he want to whip her, and he come on to the road and went to tussling, *Page 179 
and Mamma hit him one time over the head with the gun, and Wallace picked up the gun and hit him one time and then he fell. He was not hit with no hammer or hoe; he was just hit with that gun; that is all he was hit with; that gun right there is all he was hit with."
Wallace Ingram made the following statement: "We were in the field pulling corn that morning, and he come in the field and told Mamma to get the damn mules out of his cornfield or he was going to kill them, and she told him he did not have to come over there raising sand, they were Mr. Dillinger's mules and not hers. And we went across the pepper patch to get the mules, and we went on up there and heard her hollering and went back where he was at, and I got the rifle laying on the ground and hit him one lick with it."
The statement of facts comprehensively details the evidence in this case, and we shall not go into an extended discussion of it in this opinion. However, it is difficult, from the testimony alone, to fully comprehend the nature of the State's case, and some explanations appear in order.
A number of photographs, many times referred to by the witnesses, were introduced in evidence. These photographs, together with the testimony of witnesses, tended to show the following: The home of the defendants was located almost due south, and perhaps a half mile from, the home of the deceased. A dirt road led from the Ingram home to the Stratford home. On the east side of this road there was a field enclosed by a fence. On the west side there was an unenclosed cotton patch and a small tool house situated near the road in the cotton patch, and between the two homes. The scene of the first struggle, referred to in the testimony, was on or near this road. The second struggle referred to occurred further north on or near the road and nearer the Stratford home, about 141 steps from the scene of the first struggle. In the cotton patch, about 75 feet southwest of the scene of the last struggle and the location of the body of the deceased, there were physical signs indicating that someone had been sitting, lying down, or wallowing there; *Page 180 
and wide-spaced tracks led from this point to the scene of the last struggle.
The State's evidence tended to show two struggles or encounters, as above described. There was testimony as to tracks made by the deceased and tracks made by others in work shoes, indicating a struggle and that the deceased had then run to the point where the second struggle occurred; and that he had been pursued and overtaken by someone, as indicated by wide-spaced tracks. There was testimony showing signs of drops of blood leading to the body from a point about two hundred yards south of the location of the body.
Mainly the State's case rested upon incriminatory statements made by all three of the defendants and circumstantial evidence fully corroborating these statements. The State's evidence tended to show, and the jury were fully authorized to find, that after an argument about the mules, the deceased went to get his rifle, and the defendants went to get the stock out of the deceased's filed; that afterwards the deceased returned with his rifle, met the defendant Rosa Lee Ingram, and a quarrel ensued; that the deceased struck the defendant Rosa Lee Ingram and a fight followed, with Rosa Lee Ingram getting the gun away from the deceased; that the deceased broke away from Rosa Lee Ingram and started running toward his home; that Charlie and Wallace Ingram ran and headed off the deceased, who was unarmed; that the deceased, after running more than a hundred yards, turned and began running in the opposite direction, seeking to escape; that he was caught by Rosa Lee Ingram, who had pursued him, the other defendants came up, and all three of the defendants struck and beat the deceased, using a claw hammer, a hoe, and a rifle; that, during this last encounter, while the defendants were beating the deceased, one of the defendants had time to go about seventy-five feet and get a claw hammer and a hoe and return to the scene of the struggle, and these implements were used by the defendants in beating the deceased; that the mortal blow was struck the deceased at the scene of this last struggle, while he was unarmed and while he was prostrate on the ground.
Undoubtedly the jury were authorized to find that the defendants, after the deceased had completely desisted from all efforts *Page 181 
to fight, took concerted action in running him down and administering to him a fatal beating, using means and methods wholly unreasonable and unnecessary to repel any attack that the deceased might have made.
We might note that all the defendants made inculpatory statements. Whether the statements were plenary confessions is unnecessary to decide, for some of the statements made by the defendants were clearly of such an incriminating character as, when taken in connection with the other evidence in the case, to authorize the jury to find that all the defendants participated in a felonious homicide. And we might note that these statements were fully corroborated by other evidence, while the statements made by the defendants to the jury were irreconcilable with the physical evidence, including the evidence as to tracks and struggles as well as the evidence of at least five separate wounds on the head of the deceased.
The distinction between voluntary manslaughter and murder is clearly stated by our Code § 26-1007, which provides: "In all cases of voluntary manslaughter, there must be some actual assault upon the person killing, or an attempt by the person killed to commit a serious personal injury on the person killing, or other equivalent circumstances to justify the excitement of passion, and to exclude all idea of deliberation or malice, either express or implied. Provocation by words, threats, menaces, or contemptuous gestures shall in no case be sufficient to free the person killing from the guilt and crime of murder. The killing must be the result of that sudden, violent impulse of passion supposed to be irresistible; for if there should have been an interval between the assault or provocation given and the homicide, of which the jury in all cases shall be the judges, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge, and be punished as murder."
In the instant case, whether the interval between the time when the first encounter occurred and the deceased freed himself and sought to flee and the second encounter, during which he was killed by a severe beating, was a sufficient cooling time to make the offense murder, was a question which the law placed exclusively upon the jury for determination. The law prescribes *Page 182 
no particular length of time which might be considered sufficient cooling time, and we might cite many cases where the interval between an initial encounter or provocation and the fatal blow or shot was much shorter than that shown in the instant case. For instance, in Napper v. State, 200 Ga. 626
(38 S.E.2d 269), the accused sought to gain his liberty from an illegal arrest, as he had a right to do. He knocked the arresting officer down, and then immediately shot the officer while he was lying on the ground. A conviction of murder was upheld, this court holding: "There was certainly a lapse of time between the time when the accused freed himself from the arrest by the policeman and the fatal shooting by the defendant, and under the law it was the exclusive duty of the jury to say whether or not this interval was sufficient for the voice of reason and humanity to be heard. If so, the law would attribute the slaying to deliberate revenge, and the slayer would be guilty of murder." The writer of this opinion was a lone dissenter in that case, but is forced to the conclusion that the facts in the instant case establish a much stronger case, and one clearly bringing the case within the definition of murder as distinguished from voluntary manslaughter. In White v. State, 118 Ga. 787
(45 S.E. 595), this court held: "Although the parties had engaged in a struggle, and there was evidence from which it might have been inferred that the deceased, who was unarmed, was the assailant, yet where it appeared that he retired, declining further contest, and that the defendant, with an open knife in his hand, pursued the deceased, and inflicted five wounds, one of which proved fatal, the evidence was sufficient to warrant a verdict of guilty of murder. . . The fight, pursuit, number of wounds, and the attendant circumstances were amply sufficient to justify the jury in finding the defendant guilty of murder. . . It was for them to say whether the interval between the assault and the homicide was sufficient cooling time to permit the voice of reason and humanity to be heard." See also Dennis v. State, 184 Ga. 838
(193 S.E. 887).
We are constrained to hold that the jury were authorized to find that there was a sufficient cooling time for the voice of reason and humanity to be heard, and to attribute the slaying to deliberate revenge. *Page 183 
Whether or not the defendants acted with a common intent and purpose in a concerted action to make the attack upon the deceased, was a question for determination by the jury, and there was sufficient proof offered to authorize the jury to find such to be a fact. A conspiracy may be proved by conduct as well as by an express agreement; and it is unnecessary that any antecedent agreement or understanding between the alleged conspirators be shown. If the evidence shows, and in this case it was sufficient to do so, that the defendants acted with a common intent and purpose in the attack on the deceased, and that the things which were proved to have happened were within the scope of this common intent and purpose, this amounts to a conspiracy. Such being true, the act of one within the scope of the conspiracy and during its progress was the act of all. See Patterson v.State, 199 Ga. 773 (7) (35 S.E.2d 504); Simmons v.State, 196 Ga. 395 (26 S.E.2d 785); Screws v. State,188 Ga. 678 (2) (4 S.E.2d 601); McCormick v. State,176 Ga. 21 (2) (166 S.E.2d 762); Wells v. State, 72 Ga. App. 201
(1) (33 S.E.2d 563).
We are not unmindful of the principle of law, as embodied in our Code § 26-1015, that "Parents and children may mutually protect each other, and justify the defense of the person or reputation of each other." This principle of law, however, does not afford a basis for justification of a homicide upon facts showing that the danger to the relative was not impending.Kitchens v. State, 143 Ga. 290 (1) (84 S.E. 966). As stated in Daniels v. State, 162 Ga. 367 (2b) (133 S.E. 866): "To kill with any degree of deliberation, when no considerable provocation is given to the slayer by the deceased at the time, not for the purpose of preventing any impending wrong, but for the purpose of avenging a past wrong, is murder." In Osgood v. State, 63 Ga. 791, 793 (3), the court, in upholding a conviction of murder, said: "It is true that a whole family was involved in the fight with deceased, and that the defendant, rushed into help his father and kindred (Code, § 1796), and that the facts show a great riot, and that deceased went to the home of the father of the defendant. Nevertheless the facts show that this defendant struck deceased when he was down, and that he and his sister, Ellen Osgood, both inflicted unnecessary blows upon a man *Page 184 
prostrate and unable to defend himself; and from those blows with clubs and hoes the physician testified that the deceased died. The evidence is sufficient to support the verdict."
While our conclusions in this case might have been different had the State's evidence shown one encounter, with the children of Rosa Lee Ingram coming to the aid and protection of their mother, and the killing then occurring while the parties were engaged in fighting, we are not called upon to decide this question. The evidence tending to show one encounter, the deceased desisting from further efforts to fight and attempting to flee, pursuit by the accused, and the subsequent overtaking of the deceased and the infliction of mortal blows by the accused in a second encounter, the jury were confronted with this proposition: the accused would be guilty of murder or voluntary manslaughter as the jury might find the homicide to have been committed from motives of revenge or as the result of passion.
In passing on the general grounds of a motion for new trial, this court passes not on the weight but on the sufficiency of the evidence. It is our duty to determine whether the verdict as rendered can be sustained under any reasonable view taken of the proofs submitted to the jury. We are not called upon to say whether, had we been in the place of the jury, we might have found the accused guilty of a lesser offense. It was the province of the jury, and theirs alone, to put their appraisal upon the proofs submitted to them. Accordingly, the judgment must be
Affirmed. Jenkins, Chief Justice, Duckworth, PresidingJustice, Atkinson, Head, and Candler, Justices, and Judge Lillyconcur.