## SHELLMAN *v.* THE STATE.

1. An instruction that the State contended that the defendant had made certain incriminatory statements, naming them, was not subject to the criticism that the court told the jury the defendant had made incriminatory statements; nor would such instruction be subject to the objection, if properly made, that there was no evidence to support it.

2. An incriminatory statement is one which tends to establish the guilt of the accused, or one from which, with other facts, his guilt may be inferred, or one which tends to disprove some defense set up by the accused. Contradictory statements made by a defendant on his trial for murder, touching the cause of the death of the deceased, authorized an instruction that the jury should receive incriminatory statements, if they found the defendant had made any, with caution, and give them such weight as they might think proper.

No. 4140. MARCH 12, 1924.

Murder. Before Judge Meldrim. Chatham superior court. December 18, 1923.

Sam Shellman was indicted for the murder of Viola Thomas on July 13, 1923, in Chatham County. He was convicted; and upon recommendation of the jury was sentenced to imprisonment in the penitentiary for life. The evidence for the State was substantially as follows:

Martha Lewis: I knew Viola Thomas, who is now dead. Saw the defendant on Monday, three weeks before she died. Heard him talking to Viola on my porch on Montgomery Street. He came on my porch where Viola was sitting, and said, "Good evening." I saw he was mad. She asked him to go in the house, and he said he would not do so. He said to her, "Let's go," and walked a piece and said, "Let's go." She did not care to go, and he said, "I am going to kill you if it is the last thing I do." I said to her, "If it was me I would not follow him nowhere in the condition he is in." She went off with him anyhow.

Alice Prior: I knew Viola Thomas. She is now dead. I know the defendant. The last time I saw him before Viola died was in

the house. I had a talk with him. He asked if I had seen her, and he said she had run away from him. He said that the first time he saw her he was going to kill her. I married her uncle.

Dr. L. E. Martin: I am a doctor by profession. Attended Viola Thomas, Burroughs Station, Chatham County, Georgia. She died from a pistol-wound in her heart. She died on the same day she was shot, within an hour after I saw her in a charity hospital, from hemorrhage.

Julia Shellman: I am 16 years old. Am related to the defendant. Viola Thomas was my sister. She lived by herself at Burroughs Station, Chatham County, Georgia. She is now dead, having been shot by a pistol. The defendant had a pistol. I did not live with Viola, but was spending the night with her that night. Was in bed sleeping, and the report from a pistol woke me up. Saw Viola lying on the floor. She had been in the same bed with him before that. I went there about 2 o'clock in the day, went to sleep, and heard a pistol. Viola was lying on a cot. She and Sam were tussling and every time he put his hand under the pillow for the pistol, she would say: "Sam, put that up." When I woke up, Viola was lying down on the floor. She had been shot. She died the same day she was shot. When I woke up, Sam was as close to Viola as from here to that chair. She was on the floor. He said, if I said what he had done he was going to kill her and me. Sam told me to tell the people that the pistol was lying on the table and Viola was sleeping on the floor and the pistol fell off the table and exploded. I told Naomi Brown, Ellen Battise, Christine Smith, Maria Grant, Flanders Grant, Boysie Norman, Lincoln Collins, Venus Norman, and everybody that talked to me that the defendant did not do it; that it was an accident. The defendant told me to say that. He said that if I said that he done it, he was going to kill both of us and get off with it.

The defendant did not introduce any evidence, but made a statement to the jury, substantially as follows: At 10 o'clock Friday morning I laid down on the bed and dozed off to sleep. The deceased came to me and asked me to have a piece of watermelon, which I declined. She laid down with me and started tickling me under the arm. I bit her on the cheek, playing with her. She then rolled off of the bed and pulled me off, and the bedclothes fell on the floor. She said to me: "Sam, look at the cigarette butts

and tobacco down on the floor." I said: "Get a broom and sweep it up; that's what I am looking out for you." I passed by Julia, who was sitting at the table. I said: "Julia, did you strike the last match I had here?" Julia said: "No, I blowed the fire to scald Brother John's overalls with." Viola Thomas said: "Julia, why do you want to tell Sam a story? You know you struck Sam's match." I told Viola Thomas to let Julia alone, for she was a "damn token around here." I heard them tussling, and thought they were playing. I heard Viola Thomas tell Julia Shellman: "Put that gun down." Viola Thomas told her the second time to put the gun down. I heard the gun go off. I walked from the bureau drawer to the room door and looked, and Viola was standing up over Julia and standing so long that I did not know she was shot. Julia did not know it until I saw Viola roll her eyes and fell, and then I said: "Oh, Julia, you shot Viola," and Julia hugged me around the waist and said: "No, Sam, she shot herself." I said: "No, Julia, you shot Annie. Turn me loose and let go and tell her father." I went and told her father that Julia had shot Viola. Her sister Hattie came down that Friday night on the 10 o'clock train, and came out Saturday night, on the 3 o'clock train, just before the county police came out there, and threw her arm around Julia and told her to switch it off on me and say that I done it. I did not say to anybody that I proposed to kill Viola. I am an innocent man, and what these women tell about me is not so.

W. F. Chapman, in rebuttal for the State: I am chief of the county police force. I investigated the killing and arrested the defendant. He made a free and voluntary statement to me. I did not threaten him, and did not promise him anything to make a statement. He made two statements. At first he said he was lying on the couch asleep and heard the pistol go off, and he got up and the girl was shot. The next time he said he and this girl were tussling with the pistol, and it went off and accidentally killed her. The first time he said that Julia Shellman had killed the deceased. He said the shooting was accidental.

The defendant moved for a new trial on the general grounds. By an amendment to his motion he added the following grounds: (1) The court erred in charging the jury that the State further con-

tends that the prisoner made incriminatory statements to the chief of the county police as to how the homicide occurred; that one of these statements was to the effect that the pistol was discharged in a scuffle between the prisoner and the deceased; and the other statement was that he was asleep, the explosion of the pistol woke him up, and he found that the girl had been shot. The error assigned on this instruction is that the statements in question were not incriminatory statements, and therefore the charge that the defendant had made incriminatory statements was prejudicial to him. (2) The court erred in charging the jury as follows: "If. you find that there were incriminatory statements made freely and voluntarily, then you will receive them with caution, and you may give them such weight as you think proper. An incriminatory statement would not be sufficient, unless corroborated, to convict." The error assigned is that there were no incriminatory statements made. (3) The verdict is contrary to the following charge of the court: "It is contended by the defendant that the death resulted from accident. I ought to have called your attention to that principle of law, which was an oversight on my part. I now charge you that a person should not be found guilty of any crime or misdemeanor committed by misfortune or accident, and where it satisfactorily appears there was no evil design or intention, or culpable neglect." The error assigned on this charge is that the evidence clearly showed that the killing was accidental, without culpable negligence or evil design.

The trial court overruled the motion for new trial, and the defendant excepted.

*George W. Owens,* for plaintiff in error.

*George M. Napier, attorney-general, Walter C. Hartridge, solicitor-general* and *T. R. Gress, asst. atty.-gen.* contra.

HINES, J. (After stating the foreging facts.)

1. The defendant excepts to an instruction by the court to the jury, that the State contends that the prisoner made certain incriminatory statements. The defendant asserts that these statements were not incrimitory, and that, for this reason," the charge of the court that the defendant had made incriminatory statements was prejudicial to his case." The court did not tell the jury that the defendant had made incriminatory statements, but

only instructed the jury that the State contended that he had made certain specific incriminatory statements. It is one thing to tell the jury that the defendant had made incriminatory statements. It is quite a different thing to tell them that the State contends that he made such statements. The former instruction might violate our statute which prohibits the trial judge from expressing any opinion upon what has or has not been proved. If the exception to this charge had been that it was erroneous to state a contention of the State, not bottomed upon evidence, a different question would have been presented. But if the exception had been in this form, we shall undertake to show, in dealing with the next instruction which we shall consider, that it would have been without merit.

2. The judge charged the jury that if they found that the defendant had made incriminatory statements, they should receive them with caution, and give them such weight as they might think proper. The error assigned on this charge is that there is no proof of any inculpating statements. Was there proof of incriminatory statements? The defendant made two contradictory statements to the policeman, as to the manner in which the deceased came to her death. One was that he was lying upon a couch asleep, heard the pistol go off, got up, and found the deceased was shot. The other statement was that he and the deceased were tussling with the pistol and it went off and accidentally killed the deceased. Were these statements incriminatory? It is well to first define what an incriminatory statement is. Such a statement is not a confession of guilt. The latter is an admission of guilt. *Owens* v. *State,* 120 *Ga.* 296 (48 S. E. 21) ; *Riley* v. *State,* 1 *Ga. App.* 651 (57 S. E. 1031). An incriminatory statement is one which tends to establish the guilt of the accused, or one from which, with other proved facts, his guilt may be inferred, or one which tends to disprove some defense set up by the accused. "An admission, as applied to criminal cases, is the avowal of a fact or of circumstances from which guilt *may* be inferred, but only *tending* to prove the offense charged, and not amounting to a confession of guilt." *Riley* v. *State,* supra. So an acknowledgment of his presence at the scene of the crime by the defendant, while not a confession, is an incriminatory circumstance. *Dumas* v. *State,* 63 *Ga.* 600 (7).

Statements by the accused, which only tend to prove his participation in the crime charged, are incriminatory only, and are not direct, but circumstantial evidence. *Covington* v. *State,* 79 *Ga.* 687 (7 S. E. 153). It is not necessary that the admitted facts be sufficient to authorize the conviction of the defendant. In *Covington* v. *State,* supra, Judge Bleckley well said: "He admitted facts which were very powerful evidence against him of complicity in the burglary, but all the facts he admitted could have existed consistently with his perfect innocence of the crime of burglary. And it seems to have been his design in all his statements not to inculpate himself, but to exculpate himself. He made the admissions, not for the purpose of conceding that he was guilty, or with any view to confess his guilt, but in the line of a denial of guilt."

In *Kidd* v. *State,* 101 *Ga.* 528 (28 S. E. 990), there was evidence that the accused admitted being near the scene of the crime, and that he went there with another and saw the latter commit the offense. The court charged the jury in substance, that, if any such admission had been made, the jury might look to it, not as a confession of guilt, but as a circumstance to be considered by them in reaching a conclusion as to whether or not the accused was guilty of the crime charged. This court held that there was no error in this instruction. Judge Lumpkin said: "It was the right of the jury, if they found that such an admission had been made, to believe a part of it and reject the balance; and, so doing, they might have concluded that the accused was not only present when the crime was committed, but also that he participated in its perpetration, instead of being merely an innocent spectator." "Declarations made with an exculpatory object may have an inculpatory effect." *Fletcher* v. *State,* 90 *Ga.* 468 (17 S. E. 100).

In *Lee* v. *State,* 102 *Ga.* 221, 225 (29 S. E. 264), this court, speaking through Judge Little, said: "The words of themselves are entirely consistent with innocence on the one hand, and yet, with a full understanding of all the facts in the case, the jury might give them a significance which would be material in finally passing on the guilt of the accused. The words spoken were admissible in evidence, because susceptible of being construed, in the light of other facts, as an admission against his right of ownership in the property he is charged to have stolen, but were not admissible as a

confession of guilt." Contradictory statements made by a defendant when charged with murder, for the purpose of explaining the manner which the deceased was killed, are necessarily admitted upon the theory that they tend to establish his guilt or to disprove some defense set up by him.

So we are of the opinion that the instruction complained of was not erroneous for the reason that the statements made by the defendant were not incriminatory. If the jury found that the defendant made these statements, they might infer therefrom, and from all the other facts in the case, that he was guilty of the crime charged. The jury would be authorized to find that they were incriminatory or had a tendency to incriminate the defendant. Whether they did so or not, the court properly left to the determination of the jury.

3. It is alleged that the verdict is contrary to the instruction given by the court to the jury on the subject of accidental homicide. This contention is tantamount to asserting that the verdict is contrary to law, because unsupported by the evidence. In this we cannot concur. There is evidence to support the verdict.

*Judgment affirmed. All the Justices concur.*

ATKINSON, J., concurring specially. The admission by the accused of presence at the scene of the homicide was not an incriminatory statement. But the admission that the defendant and the deceased were tussling with the pistol when it went off and accidentally killed the deceased was an incriminatory statement. Some of the language in the opinion, defining incriminatory statements, is inaccurate, especially the language employed in applying the doctrine laid down in *Dumas* v. *State,* 63 *Ga.* 600.