### 33275. BROWN *v*. THE STATE.

Decided February 27, 1951. Rehearing denied March 23, 1951.

*W. L. Nix, Harris, Henson, Spence & Gower,* for plaintiff in error.

*Hope D. Stark, Solicitor-General, Marvin A. Allison,* and *Joseph D. Quillian,* contra.

MacIntyre, P. J. 1. In special ground 2 error is assigned upon the ground that the court erred in charging upon the law of confessions for the reasons (a) there was no evidence showing that the defendant had made a confession of having committed the offense of murder for which he was on trial, (b) while the evidence showed that the defendant said he shot the deceased, it also shows either justification or accident, and in neither event would it be a confession of murder, (c) the charge

constituted an intimation on the part of the court that the defendant had made a confession of having committed the offense of murder, and (d) the charge was not adjusted to the evidence because, taking into consideration any evidence of an incriminatory statement, or of a confession, the evidence offered to sustain the contention that a confession had been made did not include evidence of every essential element of murder and to make a purported confession admissible, it must be such as to admit every element of the offense charged, without explanatory or mitigating circumstances.

"A confession is a voluntary statement made by a person charged with the commission of a crime wherein he acknowledges himself to be guilty of the offense charged." *Owens* v. *State*, 120 *Ga.* 296 (2) (48 S. E. 21). This definition of a confession implies an admission of every essential element necessary to establish the crime wherewith the defendant is charged. Unless the statement of the defendant is broad enough to comprehend every essential element necessary to make out the case against him, it can not be said to be an admission of guilt, a confession. There is a difference between an incriminating statement and a confession of guilt. In an incriminating statement only one or more, but not all, of the facts entering into the criminal act is admitted, while in a confession the entire criminal act is confessed; that is, every essential element necessary to establish the crime with which the defendant is charged is admitted. *Clarke* v. *State*, 165 *Ga.* 326, 331 (140 S. E. 889). "Incriminating statements to be the equivalent of a confession of guilt must be so comprehensive as to include every act necessary to be proved by the prosecution in order to establish the defendant's guilt. . . An admission of a fact not in itself involving criminal intent is not a confession. The term confession is restricted to acknowledgment of guilt and is not a mere equivalent of words and statements." *Owens* v. *State*, supra, at page 299. "An admission of the main fact from which the essential elements of the criminal act may be inferred amounts to an admission of the crime itself" (*Owens* v. *State*, supra), as "where there is evidence showing that the defendant admitted the homicide of which he is accused, and he states in connection therewith no facts or circumstances of excuse or justification, or gives

reasons which are insufficient to furnish any legal excuse or justification, the statement amounts to a confession of guilt, and authorizes a charge on that subject." *Pressley* v. *State*, 201 *Ga.* 267, 271 (39 S. E. 2d, 478). "Evidence having been introduced upon the trial tending to show that the defendant admitted the killing, and no circumstances of justification or alleviation appearing in connection with this admission, the court did not err in charging upon the subject of confession. This is true although the defendant, when referring upon other occasions to the killing, did state circumstances of justification or mitigation." *Nail* v. *State*, 142 *Ga.* 595 (3) (83 S. E. 226). "The evidence that on the night subsequent to the homicide the accused said to the arresting officer that he had been separated from his wife and went to the house where his wife lived, to take a letter from a piano house about a piano, and that when his wife turned to go into the house he shot her, and that after the shot was fired he left the house, is sufficient to establish a confession of guilt by the accused of the murder of his wife by shooting her as charged in the indictment. Inasmuch as the law, in the absence of mitigating circumstances, declares a homicide to be felonious and done with malice, the confession by the accused that he did the act which produced the death of his wife is a confession that he killed her; and this proposition is established by the case of *Webb* v. *State*, 140 *Ga.* 779 (79 S. E. 1126)." *Lucas* v. *State*, 146 *Ga.* 315, 328 (91 S. E. 72).

Applying the foregoing rules to the following evidence, we think the charge upon the law of confessions is authorized. Lamar Crow testified in part: "I went in the [deceased's] house and found S. C. [the defendant] at the telephone and I asked him what the trouble was, he said, 'I'm trying to get a doctor,' he said, 'I shot Harold Frachiseur.' Mr. Turner was behind me and he pulled S. C. away from the telephone and Mr. Turner got the telephone and tried to get a doctor and couldn't and he called an ambulance and taken Mr. Brown [the defendant] in the other room. Mr. Brown made a statement there freely and voluntarily and no threats were made to him or anything promised him to get him to make the statement. Mr. Frachiseur said, 'I need a doctor, I need medical attention, S. C. shot me.' S. C. was standing there when Mr. Frachiseur

made that statement. S. C. said, 'Yes, I shot you. I shot you through the door.' I taken S. C. in the other room. I was standing there holding S. C. when Mr. Frachiseur fell over. There was some blood coming from Mr. Frachiseur's mouth and he was standing there drawn over and he just said 'uh' like that and fell over [dead]." Cliff Turner testified in part: "When we went in there [in the deceased's house] he [the defendant] had hold of the telephone and I took the telephone, and this Frachiseur fellow come up begging us to have something done for him, he wanted us to get a doctor, said S. C. had shot him, and he pointed up here on his shoulder. I don't know what all S. C. said, he said 'Yes, I shot you through the door,' but I didn't know what he meant about the door. I never did know until the next morning. Frachiseur was not cussing, he was just begging to have something done for him. I found out about the closet door the next morning. I went back down there the next morning; there was a hole shot through the closet door in the bedroom."

"The law presumes every homicide to be felonious, until the contrary appears, from circumstances of alleviation, of excuse, or justification; and it is incumbent on the prisoner to make out such circumstances to the satisfaction of the jury, unless they arise out of the evidence produced against him." *Hudgins* v. *State*, 2 *Ga.* 173, 188.

This ground of the motion for a new trial is not meritorious.

2. In special ground 1 error is assigned upon the court's charging upon the law of incriminating admissions upon the ground that such a charge was not adjusted to the evidence. As to whether the evidence authorized a charge on incriminating statements or admissions we think the testimony of Dick Martin, deputy sheriff, was sufficient to authorize such a charge. It is as follows: "He [the defendant] said [in the automobile on the way to a hospital after he had been brought to jail] he wouldn't have hurt Harold for anything. He said they all jumped on him and he had to do something . . He said he shot through the bathroom door to scare him, and he wouldn't have hurt him for anything." While an admission by the defendant that he killed Frachiseur, without any explanation as to why the killing was done, would give rise to a presumption

of malice, would authorize a conviction of murder, and would constitute a confession, no such presumption could be drawn from a statement which admits, but at the same time justifies, the act. The part of the statement which, if unexplained, would criminate, although it could be received as evidence of the fact it admitted (the killing), it could not, to the exclusion of another part of the statement which qualified and explained it, create a presumption that the accused was actuated by malice and was guilty of murder. *Futch* v. *State*, 90 *Ga.* 472, 481 (16 S. E. 102). They constitute a criminating admission that the accused killed Frachiseur, but further than this the words tended to deny guilt in the commission of the act (the killing) in that "they all," including the deceased, Frachiseur, jumped on the defendant and he had to do something, etc., and this was not a confession of the crime charged. As an incriminating statement or admission against the defendant, this statement was admissible in evidence and the court did not err in charging the jury on incriminating admissions and giving the distinction between a confession of guilt and criminating admissions which are mere evidentiary facts not inconsistent with innocence. *Powell* v. *State*, 101 *Ga.* 9 (29 S. E. 309); *Clarke* v. *State*, 165 *Ga.* 326, 331 (supra); *Futch* v. *State*, supra; *Shellman* v. *State*, 157 *Ga.* 788, 793 (122 S. E. 205). This ground is not meritorious.

3. In special ground 3, error is assigned upon the court's instructing the jury upon the law of dying declarations. The accuracy of the court's statement of this principle of law is not questioned. The error assigned is upon the grounds that (a) there was no evidence showing that the deceased knew he was in extremis so as to authorize a charge upon this principle, (b) the charge gave to the jury an additional theory upon which they could substantiate the charge of murder without any evidence that the deceased thought or believed that he was in the article of death, (c) the court failed to charge the jury in connection with this principle of law that caution should be observed in the use of dying declarations, and (d) the court failed to charge the jury that they might consider whether the deceased on account of the resentment was influenced and biased in making the declaration.

The witness Tom Wages testified that he was a licensed em-

balmer and that "there was a considerable amount of blood in all parts of his [the deceased's] body. . . I didn't see any other wound on him that would have killed him. The blood was round his lungs, up in the upper part of the thorax. From the location of this bullet I would say that it severed some blood vessel, that caused his death. . . The aorta is a large artery that carries the blood from the heart and distributes it over the body. . . The nature of that wound was serious enough to cause death, from severing the aorta which is located in the upper part of the breast, it comes up and makes an arch like that and severing that blood vessel with a 38 caliber bullet would be sufficient enough to cause death of a man." The witness Lamar Crow testified: "I went in the house and found S. C. [the defendant] at the telephone and I asked him what the trouble was, he said, 'I'm trying to get a doctor.' and he said, 'I shot Harold Frachiseur.' . . Mr. Frachiseur [the deceased] said, 'I need a doctor, I need medical attention, S. C. shot me.' S. C. was standing there when Mr. Frachiseur made that statement, S. C. said, 'Yes, I shot you, I shot you through the door.' I taken S. C. in the other room. I was standing there holding S. C. when Mr. Frachiseur fell over. There was some blood coming from Mr. Frachiseur's mouth and he was standing there drawn over and he just said, 'uh,' like that and fell over [dead]." The witness, Cliff Turner, Chief of Police, testified that when he went into Frachiseur's house he did not notice that Mr. Frachiseur was hurt at first but "S. C. was the one I noticed was hurt for he was bloody. I didn't know he [was hurt until?] he called me and showed me where he was shot and I looked at S. C. and said, 'You've killed him.'"

As to ground (a) of the assignment of error it was argued that because the deceased asked for a doctor, this negatived the inference from his condition that he was unaware of his dying condition. However in *Patterson* v. *State*, 199 *Ga.* 773 (4) (35 S. E. 2d, 504), it is held: "To render a dying declaration admissible in evidence, belief of the party that he is dying, as well as the fact that he is actually in extremis, is essential, but such consciousness may be inferred not only from his statements but from the nature and character of the wound and other attendant circumstances. *Campbell* v. *State*, 11 *Ga.* 353 (3); *Dumas* v.

*State,* 62 *Ga.* 58 (2); *Robinson* v. *State,* 130 *Ga.* 361 (6) (60 S. E. 1005); *Jones* v. *State,* 150 *Ga.* 775 (105 S. E. 495); *Coart* v. *State,* 156 *Ga.* 536 (3, c) (119 S. E. 723). In this case it appears that the jugular artery of the deceased had been severed, and that he died within a few minutes thereafter. The fact that the deceased might have asked for a doctor does not establish, and might not of itself be taken in the mind of the jury as in any way indicating, that the deceased was unaware of his dying condition, since it is but natural that even a dying man could wish to be attended by a physician." The cases discussed in *Parker* v. *State,* 197 *Ga.* 340, 349 (29 S. E. 2d, 61), the *Parker* case itself, and *Davis* v. *State,* 204 *Ga.* 467 (50 S. E. 2d, 604), support the view expressed in the *Patterson* case, supra, and also refute the other grounds of objection made by the defendant in this special ground. The testimony in the instant case was that the bullet fired by the defendant had severed the aorta in the deceased's chest and that he died within a few minutes after stating that the defendant had shot him, and after he had shown the wound from which he died to Cliff Turner in the defendant's presence and after Turner said to the defendant in the deceased's presence, "You have killed him," and in view of the attendant circumstances of his declaration and death, the evidence was properly allowed to go to the jury on appropriate instructions to the jury by the court on the subject of dying declarations, leaving it to the jury to determine whether the evidence was sufficient to meet the requirements of the law as to dying declarations. There is no merit in any of the assignments of error in this ground.

4. In special ground 4 error is assigned upon the court's charging upon the principle of voluntary drunkenness, upon the ground that such a charge was not adjusted to the evidence in the case. There is no assignment of error upon the accuracy of the court's statement of the law upon this principle.

Mr. S. C. Brown Sr., father of the defendant, testified that most of the people attending the party at the home of the deceased were drinking and that "S. C. [the defendant] taken a drink." At one point in his statement to the jury the defendant stated that when he and his wife arrived at the home of the deceased, they were offered drinks and they "took a little toast"

and took a drink as the other guests arrived. Tom Frachiseur, brother of the deceased, testified that he saw the defendant take a drink just "about the time he started eating and another one about middle ways." Lamar Crow, as a witness for the State, in response to the question asked by the solicitor as to the condition in which he found the defendant, stated that "he was drunk." On cross-examination Crow stated that the defendant was not bleeding at the time he arrived but he had been bleeding from a gash on his head around or above his eye; that his face was "pretty well covered" with blood; his clothing had been torn; he didn't have on much, he had on an undershirt with some shreds, something had happened to the balance of the undershirt; and that he (Crow) talked with the defendant in the little hall and he was trying to get a doctor. He repeated that he was drunk; that he didn't know whether his condition had been brought about by the injuries he had received, but that he could have been suffering from those wounds; that he talked with the defendant and that he would say he was under the influence of whisky, that he smelled it, that he had known the accused ever since 1942 and that he had never had an opportunity before to observe him while he was either sober or drunk.

Cliff Turner, another policeman, testified that when he got into the house the defendant was standing there facing the telephone, had the telephone in his hand and was using the telephone; that when he first went in he noticed the defendant had a cut place over his right eye and he had the telephone like a wild man and that he could tell that the defendant didn't know what he was doing. He could not tell if he smelled whisky on him, but that there was something on him; that he couldn't say he was drunk, but he looked like a wild man. In response to the solicitor's question if he acted as though he were under the influence of liquor, this witness stated that that was the way he acted but that he did not smell whisky. On cross-examination, this witness testified in response to the question of whether the defendant's clothes were practically torn off him that he did not notice his clothes, that they could have been, but that the defendant was "bloody as a hog."

The sheriff of the county testified that on the occasion in

question the defendant had been drinking and that he was bloody; that fighting had been going on there at the time and place in question and the defendant had participated in the fighting; that the defendant's shirt was torn and that he was bleeding. He again testified that he would say that the defendant was drinking; that he looked like a drunk man to him; that he had seen "a lot" of drunk men and had had considerable experience with them. He testified that he would not say whether the defendant's conduct was or was not brought about by his injuries and further testified that he thought his drinking and his injuries influenced his actions. He also testified that S. C. (the defendant) said that he "had not been that full but once before."

T. J. Johnson testified that when the defendant was brought out of the house on the occasion in question and was turned over to the officers that the defendant was drinking and there was something wrong with him; that he had known the defendant a long time but had not been around him much, but he was drinking heavily.

Dick Martin, a witness for the State, testified also that the defendant had been drinking.

From the foregoing evidence the jury was authorized to find that the defendant was voluntarily drunk and the court's charge on this subject was not, therefore, erroneously submitted to the jury.

5. In special ground 5 the defendant contends that the court erred in failing and refusing to submit to the jury the following appropriate and timely request to charge: "I charge you that a person who has been of sound mind may become temporarily insane. I charge you that even though you should believe the defendant has been a man of sound mind, but that shortly or immediately before he shot the deceased, if you believe he did shoot the deceased, he became temporarily insane, and he shot the deceased while acting under the impulse of such temporary insanity, and at the time he was not possessed of sound mind and reason sufficient for him to know right from wrong, he would not be guilty of either murder, voluntary manslaughter, involuntary manslaughter, or of shooting at another, and if you believe this to be the truth of the case, he should be

acquitted of either and all of these offenses." On the subject of insanity the court charged the jury as follows: "Every person is presumed to intend the natural and necessary consequences of his acts. Therefore, the law presumes that every act which is in itself unlawful was criminally intended, until the contrary is made to appear, but the question of intention rests finally with the jury. A person shall be considered of sound mind who is neither an idiot, a lunatic, nor afflicted with insanity, and who has arrived at the age of 14, or before that age if such person knows the distinction between good and evil. A lunatic or person insane, without lucid intervals, shall not be found guilty of any crime or misdemeanor with which he may be charged, provided the act who [which?] charged as criminal was committed in the condition of such lunacy or insanity; but if a lunatic has lucid intervals of understanding, he shall answer for what he does in those intervals as if he had no deficiency. Now it is contended by the defendant in this case that because of certain injuries to his head and brains received by him shortly before the alleged homicide, that he was in such a mental state and condition that he was in what is termed by our law as temporary insanity. It is contended by the State on the other hand that that was not true. Now the law presumed that every man is sane until it is made to appear to the contrary that he is insane or of unsound mind. On the question of sanity or insanity the general rule in this State is that if a man has reason sufficient to distinguish between wrong and right in relation to a particular act about to be committed, he is criminally responsible. On the other hand, if he should not have reason sufficient to distinguish between right and wrong in relation to a particular act about to be committed, he would be insane in legal contemplation and not criminally responsible for such act. Where the issue of insanity is involved, whether temporary or complete, the burden is on the defendant to show to the reasonable satisfaction of the jury that at the time of the alleged commission of the act charged against him he was insane. Whether or not that has been done either by evidence of the State or by the defendant or both is a question to be determined by the jury."

"The court is not bound to charge in the exact language of

the request; and a new trial will not be granted for refusing to charge as requested, when the charge given substantially covers the request, which request was not more specific in its application than was the charge as given." *Brown* v. *State*, 195 *Ga.* 430 (24 S. E. 2d, 312). Applying this rule to the charge requested and the charge as given on the subject of insanity in this case, we find no error in the court's refusal to give the requested charge, as the charge given was a correct and more accurate statement of the law than the charge requested.

The ruling just made is also applicable to the following request to charge: "I charge you that if you believe the defendant, at some time shortly prior to the shooting of the deceased, if you believe the defendant shot the deceased, suffered bodily or mental injuries in any manner which caused him to lose his mental capacities to such an extent that he did not have sufficient mental understanding to know right from wrong, and while in this condition he fired a gun or pistol which caused the death of the deceased, and that at the time of the firing of such gun or pistol he did not have sufficient mental understanding to know and understand the probable results of the firing of such gun or pistol, and that he did not fire such gun or pistol at the deceased with an intention to kill or wound him, but that he did so without any [intention of committing?] such murder, voluntary manslaughter, or involuntary manslaughter, or of shooting at another, and if you believe such condition existed at the time such shot was fired, it would be your duty to acquit him or either and all of these offenses." Special grounds 5 and 5-A are without merit.

6. In special grounds 6, 7, 8, and 9, error is assigned upon the court's refusal to charge upon request the law on involuntary manslaughter, the law on shooting at another, and the law on assault and battery, for the reason that the evidence raised each of these issues. In none of these grounds is it demonstrated that the evidence does raise these issues. None of these grounds sets out the pertinent evidence said to raise the several issues. Indeed, no evidence whatsoever is set forth in any of them. "Under the repeated rulings of the Supreme Court and of this court, each special ground of a motion for a new trial must be complete and understandable within itself; and when so incom-

plete as to require a reference to the brief of the evidence, or to some other portion of the record, in order to determine either what was the alleged error or whether the error was material, the ground will not be considered by the reviewing court. *Franklin* v. *State*, 28 *Ga. App.* 460 (1 b, c) (112 S. E. 170), and citations. Under this ruling, where a ground of a motion for a new trial complains of the failure of the judge to charge certain principles of law (which the ground alleges should have been charged under the evidence adduced upon the trial), but where no evidence whatsoever is set forth in the ground, the ground is not complete and understandable within itself, and this court will not search through the brief of the evidence [which in the instant case consists of some eighty typewritten pages] to discover whether there was any evidence requiring such instructions." *Beavers* v. *State*, 33 *Ga. App.* 371 (126 S. E. 305). See also, *Pyle* v. *State*, 4 *Ga. App.* 811, 814 (1) (62 S. E. 540). This ruling disposes of special grounds 6, 7, 8, and 9 of the motion for a new trial.

7. In special ground 10 error is assigned upon the refusal of the court to grant a timely motion for mistrial which was predicated upon two special grounds as follows: "(a) This trial was begun in said court on March 27, 1950. After a jury had been selected, evidence was introduced the balance of the day. When the hour for adjournment arrived the court instructed the jury that they were to be kept together and that they should be together in a body at all times and that their needs and wants would be supplied to them by the bailiff in charge of them. Counsel, upon reconvening of court on the next morning brought to the attention of the court that the jury had not been kept together, and had been allowed to disperse from each other during the night, and he moved the court to grant a mistrial upon these grounds. . . (b) Counsel for defendant also made his motion predicated upon an additional ground to the effect that during the period of intermissions and particularly during the early morning of the day following the night they should have been kept together, some of the jurors were permitted to enter a barbershop and there to read the daily newspaper, and particularly an issue of the *Atlanta Constitution* of that date which obtained [contained?] a highly inflammatory and prejudicial re-

port of the case then on trial." It appears from the allegations in this special ground of the motion for a new trial that the court, sitting as a trior of the facts on the motion for mistrial heard evidence upon the questions of the jury's dispersal and reading of the newspaper containing an account of the trial. After all the evidence was introduced on the motion for a mistrial, the court overruled the motion and gave the following cautionary instruction to the jury: "Gentlemen of the jury, the court instructs you that you will not be influenced in any degree whatsoever by anything you might have read in the newspaper about which the court interrogated you gentlemen; but you will completely erase anything you may have read then from your minds and you will be governed in deciding the issue and determining the issues in this case by the evidence as developed from the witnesses and the defendant's statement, if he should make a statement, and by the documentary evidence that may be instructed [introduced?]. In other words, your verdict must be made entirely and solely on the evidence and the defendant's statement in this case."

We shall deal with the assignments of error in the order in which they are subdivided by the defendant in this ground.

(a) "Where there has been an improper separation of the jury during the trial, the prisoner, if found guilty, is entitled to the benefit of the presumption that the irregularity has been hurtful to him; and the onus is upon the State to show, beyond a reasonable doubt, that the defendant has sustained no injury on account of the separation." *Monroe* v. *State*, 5 *Ga.* 85 (10).

On the question of the separation of the jurors the two bailiffs in charge of the jury testified as follows: Mr. J. T. Sweat: "I was in charge of the jury during the night and early morning. I stayed with them. I kept them in a room at the Hotel, locked up. I think they occupied four rooms. I slept in the room with some of the jury but got out and walked up to the other rooms. I didn't sleep much during the night, just a little bit about day. Part of the time I sit up in a chair and part of the time I laid down on the bed. . ." Mr. Brown, the other bailiff: ". . I wasn't in charge of the jury in this case anytime during last night. I woke some of them up early this morning. They was coming out of their room and going to the

toilet. That's the toilet on the second floor of the hotel. I didn't see but two at a time go to the toilet. While they was in the toilet the rest of the jury was in their room. They occupied three rooms. Mr. Sweat was next to me, the room right in the back, end room, and the toilet, and slept in the room with two jurors. We went to bed about 10 o'clock. I woke up about 4 o'clock, 3 o'clock, I guess, I was awake off and on but I .didn't get up. When I noticed some of the jurors this morning some of them was going to the toilet. Mr. Sweat put them to bed. There wasn't anybody in the hall and there wasn't anybody in the toilet for I looked in there and there was just one juror in there. We carried them to breakfast at the hotel  . .''

Where, as here, the court, sitting as a trior of the facts, was authorized to find that it affirmatively appeared that the jurors who temporarily separated themselves from the jury had no communication with anyone upon the subject of the trial, either directly, by conversation, or individually, by hearing observations of others, the presumption of injury arising from such irregularity would be sufficiently rebutted, and the unauthorized separation of the jury will not, under the facts of this case, require the grant of a new trial (*Waller* v. *State*, 2 *Ga. App.* 636, 58 S. E. 1106), in the absence of a showing of a plain abuse of discretion by the trial court. *Morakes* v. *State*, 201 *Ga.* 425, 431 (40 S. E. 2d, 120). ·

(b) Relative to the reading of the newspaper by some members of the jury, the defendant contends that when the jury in its entirety went into a barbershop, some of the jurors there read the daily newspaper, the *Atlanta Constitution* of that date which contained an article concerning the trial of the defendant in this case as follows: "Murder Trial Started at Lawrenceville. Lawrenceville—The murder trial of S. C. Brown Jr. charged with the fatal shooting here on October 23 of his brother-in-law, Harold L. Frachiseur, began in Gwinnett County Superior Court yesterday. Frachiseur, prominent Lawrenceville and Atlanta advertising man, was slain with one pistol shot fired through the heart after a family argument in the victim's home, [said?] Sheriff T. J. Johnson, Brown was ordered to leave the residence early on the night of the shooting, but later returned waving a pistol and fired at Frachiseur as he sought refuge in a closet

the sheriff declared. Murder warrants were sworn out against Brown by two brothers of the dead man, Tom and Gordon Frachiseur.. Several witnesses for the State testified yesterday, and the trial will be continued today. It is expected to last several days. The case is being tried before Judge Clifford Pratt, with Sol. Hope D. Stark handling the prosecution."

There is no contention that the article contained any incorrect statement of what had occurred at the trial. The jurors already knew what had occurred on the trial and it could do no harm for them to read what they already knew. *Sligh* v. *State*, 171 *Ga.* 92, 104, 106 (154 S. E. 799). The only thing in the article which was not a correct statement of what had occurred during the progress of the trial was that the reporter gave his opinion that the trial was expected to last several days, and this latter statement, we think, was not harmful error in view of the court's interrogation of those jurors who had read the article concerning the trial and who stated they were not influenced by what they read; and in view of the court's cautionary instruction to the jury to erase any impressions made by the newspaper article from their minds. This ground of the motion for a new trial is not meritorious.

8. The defendant does not argue the general grounds of his motion for a new trial other than to state in his supplemental brief: "Plaintiff in error [the defendant] does not abandon these grounds [general] but insists that under the general grounds, the verdict of the jury is contrary to law, and is unsupported by sufficient legal evidence to warrant a conviction." We have, however, examined the some eighty pages of the brief of evidence and are convinced that the evidence was sufficient to authorize the verdict.

The court did not err in overruling the motion for a new trial for any reason assigned therein.

*Judgment affirmed. Gardner and Townsend, JJ., concur.*