## 47900. GEIGER v. THE STATE.

CLARK, Judge. This record is a record of a record. Comprising a total of 3,411 pages, it is considered to be the lengthiest in the 67 years of our court's existence. Of these, 2,811 pages constitute the evidence transcript of a three-weeks trial. The nature of the

enumerations of error require us to mention these details.

The appellant being a physician whose medical license was revoked as a result of the events reported herein and for which he is now serving a fifteen-year sentence, this case represents another heart-break chapter in the sad, sordid story of today's drug culture age. The version presented by the prosecution is diametrically opposite to that of the defense. "Mephistophelean machinations" would be an appropriate description of the case as presented by the state as contrasted with a "dedicated doctor" victimized by a purported frame-up scheme as contended by defendant.

The state's evidence charged accused with the exchange of drugs and prescriptions for drugs in return for sexual favors, with prevailing upon a co-defendant female who was not tried simultaneously with him to forge checks so as to obtain desired merchandise items for drugs, and with other violations of the Uniform Narcotics Act and of the Georgia Drug Abuse Control Act such as selling drugs outright, writing prescriptions for such drugs without examinations or taking of medical histories, and by dispensing such drugs without maintaining required records. The state's case focused on the activity of four individuals who, as patients, had obtained various types and quantities of drugs through the means described.

The defense was manifold in nature. The accused sought to show that he was the victim of a frame-up conspiracy by a husband and wife (Jack and Janet Mott) who had filed a civil suit against him for $500,000 alleging the doctor had caused the wife to become a drug addict. Additionally it was sought to show the accused to be the victim of a police plot with the use of planted evidence. The characters of the four principal witnesses were attacked by showing one to be a prostitute and the other three to have been convicted felons with hopes of receiving favored treatment through their testimony against the accused.

During the accused's unsworn statement which took two days for presentation and covered 727 pages of the transcript, the defendant reviewed his personal history as a country doctor's son who sought to follow his father's selfless example of service to everyone. During this unsworn statement the accused testified as to the manner in which he had risen from dire poverty, proceeded to obtain his education overcoming by his own efforts his lack of funds. He related his World War II hazards as a navigator of a B-17 Flying Fortress which was shot down on its

third mission when he parachuted to safety but was captured by the Germans. He described the manner in which he had begun as a penniless practitioner and the long hours and arduous labors whereby he had brought his practice to the point that he was grossing more than $100,000 annually. Through his pastor in the church where he had taught Sunday School he introduced proof of his good character. During this presentation he sought to explain each circumstance so that what appeared to be incriminating events were in fact presented by him as confirmations of his innocence.

The case involved ten indictments with a total of 34 counts. He received acquittals on two indictments and was found not guilty on two counts of another indictment but was convicted of the remaining counts and given sentences totaling 15 years.

Additional facts will be discussed in the body of this opinion as we deal with the twenty-four enumerations of error. In doing so we proceed chronologically rather than in numerical order.

1. *Motion to suppress* (Enumeration No. 2). The initial development which led to the implication of the accused doctor was the appearance on January 14, 1970, in the office of the District Attorney of Jack Mott with his personal attorney. The result of this visit was a telephoned instruction to the East Point police to arrest the wife, Janet Mott, concerning whom a description was given and who was then expected to be at the doctor's office. She was apprehended in the office parking lot. Upon identification being requested she gave the name "Carolyn Cooper" and referred the officers to Dr. Geiger for confirmation of identity. Dr. Geiger addressed her by her proper name, Janet Mott. Somehow she was left alone for a brief interval in the doctor's private office. This was an element pointed out by Dr. Geiger as confirming possibility of his being victimized in a police plot because a pistol was later found in his desk which he voluntarily delivered to the police with some discovered credit cards. The consequence was a search warrant obtained upon an affidavit made by the investigator attached to the District Attorney's office. This affidavit was made at 3 o'clock p.m. on January 16, 1970. The affidavit stated the property to be seized at the doctor's office address was a Georgia driver's license, No. 0642323, issued to Carolyn L. Cooper and a Realistic tape recorder, Model H901, it being stated the property was tangible evidence of the commission of the crimes of forgery and receiving stolen property. The probable cause read as follows: "That on

January 14, 1970, Janet Mott W/F fraudulently obtained a Browning automatic pistol, Serial No. 114202, valued at $94.50 from Berryman Sports Center, Main Street, East Point, Fulton [County], Georgia by forging the name of Carolyn Cooper upon a check and using said driver's license as identification. Said pistol and other identification bearing the name of Carolyn Cooper being recovered in the office described above at the time of her arrest by East Point detectives on January 15, 1970, at the above described office known as 1618 Thompson Avenue, East Point, Fulton [County], Georgia for the offense of forgery. Also, Jack Mott, husband of Janet Mott, has stated that he has recently seen a tape recorder in the possession of his wife, that was purchased by his wife by forging the signature of another. Jack Mott has presented a piece of paper bearing a list of items to be obtained by Janet Mott by using the name of another in exchange for dangerous drugs. The doctor, Hugh Geiger, Jr. has given him a prescription for thirty (30) Bephetamine tablets which were to be sold by Jack Mott. That Jack Mott has seen dangerous drugs in the possession of his wife, Janet Mott, that was given to her by Dr. Hugh Geiger, Jr. in exchange for items obtained by offense of forgeries." It should be noted this affidavit was executed in the presence of a Superior Court Judge, Hon. Charles A. Wofford, who issued the search warrant. The search of the nineteen rooms constituting the office premises began shortly thereafter. This search consumed six hours by a team of six law enforcement officers. One of six attorneys who have over a period of time represented the accused was present. Immediately following the completion of the search an arrest warrant was issued for the accused.

A motion to suppress the seized evidence was filed and subsequently amended. This was heard before Hon. Elmo Holt on January 26, 1970, with defendant represented by three of his attorneys, one of whom was retained only for this hearing. The transcript of this extensive hearing totals 121 pages. Much of it dealt with alleged pornographic photographs. Judge Holt ruled the search to have been lawful and admitted 28 of the photographs and suppressed photographs Numbers 29 through 60, inclusive. Another extended motion to suppress was filed April 9, 1971, which covers pages 61 through 124 of the record in which there is a sentence by sentence analysis of the district attorney's investigator's affidavit and extensive legal argument to support the contention that the search was illegal and without

probable cause. It included a transcript of the January 26, 1970, hearing with a prayer to vacate the previous order. This was filed by another attorney, R. John Genins, who handled the actual trial. It was argued on April 16, 1971, before Hon. Osgood O. Williams, who thereafter presided at the trial. Judge Williams ruled the original order by Judge Holt to be res judicata. It is noted that no attempt was made to introduce any photographs at the trial but other items including a Colt pistol taken from a large office safe were introduced.

There were some factual inaccuracies in the affidavit. The fact that there is an immaterial factual inaccuracy is not fatal to an otherwise adequate showing of probable cause. *Summerville v. State,* 226 Ga. 854, 858 (178 SE2d 162); *Lee v. State,* 124 Ga. App. 397, 398 (184 SE2d 41). The proper test is whether the factual inaccuracy destroys the otherwise adequate showing of probable cause. The only inaccurate portion of this warrant relates to when the gun and identification cards were found at the doctor's office which is not sufficient cause to warrant a declaration of legal invalidity.

It should be remembered that considerably less is required to show probable cause for issuance of a search warrant than is required to prove guilt. Draper v. U.S., 358 U.S. 307, 311. The most recent United States Supreme Court case, U.S. v. Harris, 403 U.S. 573, illustrates the present trend towards a lessening of prior strictness for requirements concerning the necessary data as to informants and facts for the issuance of a search warrant. As to the D.A.'s investigator being entitled to rely on the information received from other police officers see *Strauss v. Stynchcombe,* 224 Ga. 859, 863 (165 SE2d 302) and *DePalma v. State,* 228 Ga. 272, 275 (185 SE2d 53). This enumeration of error is without merit.

2. *Voir dire* (Enumeration No. 4). In what the trial judge described as "a novel situation" an event occurred during the voir dire of the jury panel which appellant asserts resulted in his being denied a fair and impartial trial. During the voir dire a juror was called by name and address and occupation, he being a university librarian. In the initial interrogation he denied having served on a criminal jury at any time and stated that he would be fair and impartial. Upon cross examination by defense counsel he denied specifically having been a member of a jury which had tried a murder case in 1969 at which the then defendant was given the electric chair. Defense counsel had through its pre-trial

investigation of the individual members of the panel been informed that an individual by this name, residing at that address and being a university librarian had in fact served on that jury. A thorough interrogation by defense counsel followed this denial after which both the State and the accused accepted this juror.

After the conviction a special hearing was held by Judge Williams on September 20, 1972, in connection with defendant's motion for a new trial which included the averment dealing with the allegedly intentional false answers given by this juror. Under oath and during careful examination and cross examination this juror insisted he did not remember serving on the 1969 murder case while at the same time he acknowledged the name, address and occupation shown on the court record as being identical with his. He reiterated having no recollection of ever having served then or on any other criminal case.

It is essential that jurors answer truthfully during the voir dire so that the jury shall be composed of impartial laymen and thereby guaranteeing a fair trial. If this juror had possessed a legal disqualification then a false answer which would have led to the exclusion of such juror would require a new trial. *Glover v. Maddox,* 100 Ga. App. 262 (5) (111 SE2d 164). Furthermore, if counsel propounding the questions had notice of alleged disqualification of the prospective juror and could not by due diligence have discovered it, a new trial would also result. *Tatum v. State,* 206 Ga. 171 (56 SE2d 518). But "If an accused or his counsel had knowledge of the disqualification of a petit juror, in that he had served on the grand jury, or *by proper diligence could have ascertained the fact,* and interposed no objection in the trial court, the accused is deemed to have waived the disqualification. [Cits.]" *Green v. Caldwell,* 229 Ga. 650 (4) (193 SE2d 847). (Emphasis supplied). Similar rulings are in *Moore v. Farmers' Mut. Ins. Assn.,* 107 Ga. 199 (2) (33 SE 65); *Rhodes v. State,* 122 Ga. 568 (2) (50 SE 361); *Bean v. Barron,* 176 Ga. 285 (1) (168 SE 259); *Millers Nat. Ins. Co. v. Waters,* 97 Ga. App. 103, 109 (102 SE2d 193); *Norman v. Norman,* 103 Ga. App. 626 (2) (120 SE2d 42).

Although defense counsel through pre-trial investigation of the panel knew that an individual by this name residing at this address who was a university librarian had served on the 1969 murder jury, he might well have been misled by the answers or even decided this to be an unusual coincidence. Accordingly, we

do not limit our ruling to the accused having made a waiver because of his knowledge of the juror's background.

Instead we consider the essential element of impartiality and the necessity of making certain that accused was not deprived of his absolute right to a fair trial. "A big part of the battle is the selection of the jury, and an impartial jury is the cornerstone of the fairness of trial by jury." *Melson v. Dickson,* 63 Ga. 682, 686 (36 AR 128). Therefore, we place our reliance upon such authorities as *Kennedy v. State,* 191 Ga. 22 (11 SE2d 179) and *Jennings v. Autry,* 94 Ga. App. 344 (94 SE2d 629) for our decision to sustain the trial judge in his overruling of this ground of the new trial motion. In the *Kennedy* case our Supreme Court ruled that the post-trial investigation showed the juror who would otherwise have been disqualified had in fact been a fair and impartial juror. Similarly in the third headnote of *Jennings v. Autry,* supra, our court said "Such disqualification of such a juror, however, will not result in the grant of a new trial unless it is shown that the movant was injured by such a disqualified juror's serving upon the jury or that his opponent was benefited thereby. [Cits.]"

In the instant case the juror was not per se disqualified. A complete voir dire examination by defense counsel aimed at revealing any inclination, leaning, or bias satisfied the accused's advocate. The post-trial detailed investigation did not disclose that the juror had in fact acted other than impartially. Even if this juror deliberately answered falsely it has not been shown that he had an evil motive or that he acted otherwise as one of the twelve jurors than with the required impartiality. Nothing has been shown to establish the allegation made by accused that the juror "was tainted for the reason that he had an ulterior motive" in giving purportedly untrue answers.

(a) *Voir dire* (Enumeration No. 4). There is an additional reason for this court to rule adversely to the defendant's contention concerning this juror. In order for a new trial to be obtained in a situation dealing with a juror such as occurred here the appellant must show that he has exhausted his strikes or that there was some advantage to the state in this juror having been permitted to serve. The record shows that he was the ninth juror selected as being acceptable to both the state and the accused. At that point the defendant had exercised only fourteen peremptory challenges. As the voir dire continued the accused used only four additional strikes before obtaining the trial panel

of twelve jurors. Accordingly it is clear that the defendant did not exhaust his strikes. Code § 59-805.

In *Ethridge v. State,* 163 Ga. 186 (1b) (136 SE 72), in a murder case the trial judge erroneously permitted a juror to serve where he was in fact legally incompetent because of relationship. The Supreme Court held that "When error is assigned, it must be shown that the plaintiff in error was in some way injured, or that there was an advantage to the state. It is held under the facts of this case that the plaintiff in error was not injured by the above ruling, it not being shown that plaintiff in error having exhausted his strikes, or that the state was benefited; and therefore it is not cause for a new trial." In the case sub judice the juror under attack was neither disqualified nor incompetent. As his counsel had knowledge of the similarity of name, address, and occupation and had not exhausted his peremptory strikes and did not show that the state was benefited the defendant has failed to make the showing necessary to entitle him to a new trial. *Cabaniss v. State,* 8 Ga. App. 129 (8) (68 SE 849); *Ford v. State,* 12 Ga. App. 228 (2) (76 SE 1079); *Felker v. Johnson,* 53 Ga. App. 390 (2) (186 SE 144).

3. *Corroboration of accomplice* (Enumerations Nos. 1 and 5). Four of the ten indictments named Janet Mott as a co-defendant with one charging her and Dr. Geiger with conspiracy to commit a crime. Appellant was tried singly and our record does not indicate what was done with the co-defendant whose testimony was a key factor in the conviction. Appellant argued that with the exception of one indictment which charged Dr. Geiger with having ordered drugs after the revocation of his medical license that all of the other charges are alleged to have been committed in joint action with another who was indicted or could have been indicted from the allegations charging the crime and the evidence adduced at the trial. Relying upon Code § 38-121 and such cases as *Sutton v. State,* 104 Ga. App. 552 (122 SE2d 303) and *Allen v. State,* 215 Ga. 455 (2) (111 SE2d 70) the appellant argues that the evidence is insufficient to convict Dr. Geiger.

Our study of the record has led us to the view that the evidence here meets the requirements stated in *Waldrop v. State,* 221 Ga. 319, 321 (144 SE2d 372). The first division of that decision reads: "To authorize a felony conviction on the testimony of an accomplice, it is necessary that the evidence of the accomplice be corroborated (Code § 38-121), and 'the corroborating circumstances should be such as, independently of his testimony,

to lead to the inference that the defendant is guilty.' [Cits.] But 'it is not required that this corroboration shall of itself be sufficient to warrant a verdict, or that the testimony of the accomplice be corroborated in every material particular... Slight evidence from an extraneous source identifying the accused as a participator in the criminal act will be sufficient corroboration of the accomplice to support a verdict... The sufficiency of the corroboration of the testimony of the accomplice to produce conviction of the defendant's guilt is peculiarly a matter for the jury to determine. If the verdict is founded on slight evidence of corroboration connecting the defendant with the crime, it can not be said, as a matter of law, that the verdict is contrary to the evidence.' [Cits.]" It would unduly lengthen this opinion to deal specifically with the independent evidence pointing toward the guilt of the accused which was accepted by the jury.

4. *Denial of right of cross examination* (Enumerations Nos. 6, 7, 8, 9, 10, 11, 12, 13, 14 and 16). There are ten enumerations of error in which defendant's counsel contends he was denied a thorough and sifting cross examination of certain state's witnesses. These rulings dealt with queries as to why a state's witness had not been arrested, the reason for permitting the co-defendant to remain at liberty, why police officers left an arrested but unsearched suspect unobserved in the doctor's office, the propriety of an office safe being used for storage of drugs, and the practice of a physician to keep his safe locked. There exists the right of every party to a thorough and sifting cross examination (Code § 38-1705) which has in fact been held to be a constitutional right. *Ralph v. State,* 124 Ga. 81 (52 SE 298, 2 LRA (NS) 509). Great latitude should be allowed in cross examination *(Mitchell v. State,* 71 Ga. 128 (6)) because this right of cross examination is "one of the safeguards essential to a fair trial." Alford v. U. S., 282 U.S. 687, 692 (75 L E 624, 628, 51 SC 218).

It is recognized, however, that the scope of cross examination is not unlimited. The extent necessarily must rest largly within the discretion of the trial judge in order to keep the questioning within reasonable bounds. It is error only when this discretionary authority is abused. *Gravitt v. State,* 220 Ga. 781, 785 (141 SE2d 893); *Moore v. State,* 221 Ga. 636, 639 (146 SE2d 895); *Sullivan v. State,* 222 Ga. 691 (2) (152 SE2d 382). The extent of cross examination can be curtailed if the inquiry is not relevant nor material. *Clifton v. State,* 187 Ga. 502, 508 (2 SE2d

102); *Waller v. State,* 213 Ga. 291, 294 (99 SE2d 113). Furthermore, cross examination is not permitted to become repetitious as to matters already fully developed on ·cross examination. *Thompson v. State,* 166 Ga. 758 (10) (144 SE 301); *Sims v. State,* 177 Ga. 266 (2) (170 SE 58); *W. & A.R. v. Hart,* 95 Ga. App. 810 (99 SE2d 302). Additionally, prejudice must be shown by the exclusion of the question asked on cross examination. *Dill v. State,* 222 Ga. 793 (152 SE2d 741). Such prejudice is not shown where counsel obtained substantially the same answer during later questioning. *Curtis v. State,* 224 Ga. 870 (6) (165 SE2d 150); *Freeman v. State,* 230 Ga. 85 (1) (195 SE2d 416).

Our examination of the lengthy transcript confirms that a thorough and sifting cross examination of each state witness was permitted and that the rulings of the trial judge in denying the specific questions contained in each of the nine error enumerations dealing with cross examination were correct.

5. *Standards for handwriting comparisons* (Enumeration No. 15). A contention is made that the court erred in allowing the state's witness, Mary Beacom, to testify as to certain specimens of appellant's handwriting on the basis that the state had failed to meet the standards required by law. (T. 1363). This was based on the ground that photostats, not the originals, were furnished defense counsel. Code § 38-709 deals with comparison of writings and provides: "Other writings, proved or acknowledged to be genuine, may be admitted in evidence for the purpose of comparison by the jury. Such other new papers, when intended to be introduced, shall be submitted to the opposite party before he announces himself ready for trial."

*Mitchell v. State,* 89 Ga. App. 80, 87 (78 SE2d 563) ruled photostats did not satisfy this codal requisite and further that Code Ann. § 38-710 permitting photostatic copies of original writings or records made in the regular course of business to be introduced as original evidence has no bearing upon Code § 38-709. But, in a later case our court ruled that "the purpose of Code § 38-709 was fully met when the state made known to counsel for the accused the existence of the documents and that they were available for the examination, this well in advance of the trial, and that no cause for complaint exists if counsel for the accused failed to take advantage of the offer." *Padula v. State,* 119 Ga. App. 562 (1) (167 SE2d 696). Because this situation existed here we rule this enumeration of error to be without merit.

6. *Mistrial motion* (Enumeration No. 23). During the state's cross examination of defendant's character witness, his pastor at whose church defendant had taught Sunday School, defense counsel objected to a question asked by the district attorney concerning alleged sex parties in the doctor's office simultaneously with a motion for mistrial. (T. 1650-1651). The objection was sustained and this motion for mistrial was overruled. At the same time the court instructed the jury specifically that the content of this question was not to be considered and that any inference that might have been created by the illegal question was to be completely eliminated and it was to have no bearing on their decision. In the light of the over-all situation here and the manner in which the judge acted, the court's instruction to the jury was sufficient to eliminate the effect of the question. See *Avery v. State,* 209 Ga. 116, 128 (70 SE2d 716); *Starr v. State,* 209 Ga. 258 (5b) (71 SE2d 654). Additionally, there was no renewal of the mistrial motion nor were further instructions requested. *Gee v. State,* 110 Ga. App. 439 (5) (138 SE2d 700); *Barnes v. State,* 111 Ga. App. 348 (141 SE2d 785); *Lane v. State,* 118 Ga. App. 688 (3) (165 SE2d 474); *Clyatt v. State,* 126 Ga. App. 779 (4b) (192 SE2d 417). Accordingly there is no merit in this enumeration of error.

7. *Motions for directed verdicts of acquittal overruled* (Enumerations 16, 17, 18, 19, 20, 21 and 22). At the close of the state's evidence defense counsel made motions for directed verdicts of not guilty as to seven of the ten indictments. Each of these motions was individually overruled and error is assigned thereon.

It is unnecessary for us to examine whether the evidence warranted the trial court's adverse rulings because at the time of the trial in April 1971 the law which authorized directed verdicts in criminal cases had not become effective. This statute, Ga. L. 1971, pp. 460, 461 and codified as Code Ann. § 27-1802 was approved April 5, 1971, but was not expressly made effective upon its approval. Accordingly the statute did not become effective until July 1, 1971. Code Ann. § 102-111. Therefore it was not error to deny the motions for directed verdicts made by appellant. *Pritchard v. State,* 224 Ga. 776 (2) (164 SE2d 808); *Ford v. State,* 227 Ga. 279 (2) (180 SE2d 545). See also *Morris v. State,* 228 Ga. 39, 51 (184 SE2d 82).

8. *Adequate and effective counsel* (Enumerations Nos. 3 and 24). During the oral argument Public Defender Jess H. Watson

emphasized his earnest conviction that a new trial should be granted his client by reason of a mid-trial change of attorneys. This occurred at the end of the second week of the three-weeks trial at which point he was substituted for the retained attorney who became unable to continue because of illness. Arising from his belief that despite his best efforts the complexity of the case would confirm the end result to have been a deprivation of effective and competent counsel to the accused, the Public Defender urged a reading by this court of the complete record. Even without such request this is generally done by at least one judge and frequently by all. This is particularly true when we are required to decide a case of such nature as this sub judice.

To deal properly with appellant's contention concerning lack of counsel it is necessary to relate the developments which caused the change of counsel. After the state had rested its case the defense presented seven witnesses, the last being the defendant's pastor who was a character witness. During the examination of the preacher the court recessed for lunch. (T. 1654). This was on Friday of the second week of trial. Upon court being reconvened Attorney Genins stated his client believed the physical condition of Mr. Genins was such that he was not adequately representing defendant. Genins had previously become ill on two occasions. Those sicknesses resulted in recesses but this latest ailment was disabling in nature to the extent that accused addressed the bench to the effect that "I cannot communicate with him effectively. He cannot talk coherently." (T. 1654). During the ensuing dialogue the appellant stated ". . . I am not seeking a new trial, your honor. I am not seeking anything except I am not adequately represented . . ." (T. 1656). He further explained he would rather proceed on his own without adequate representation (T. 1658). In view of the attorney having previously received recesses because of illness the court discussed with the defendant the latter's idea as to the type of representation he had received during the previous two weeks of trial. Defendant stated he had no complaints of his representation excepting for the last few hours. (T. 1668). The defendant further made clear in his conversation with the court that he wanted the present trial carried to its conclusion: "Win, lose, or draw I want to go through with the trial and get it settled one way or another. I am not afraid of the trial, but I feel I want to be represented." (T. 1670). He further said "We have no fault to find with the jury; we have no fault to find with the court. I just think I am entitled to good representation." (T. 1670). He

then stated that "All I ask is somebody be defending me and go forward." (T. 1672).

In reply to a query from the district attorney as to whether Dr. Geiger had felt any compulsion from outside sources in reaching his personal decision to complete the present trial he answered "No, if your honor feels we can I would prefer we continue. I am not looking for a new trial." (T. 1675). "I don't feel I am doing this out of compulsion." (T. 1676).

Defendant then requested the court to allow him to take an active part in the defense and to appoint counsel to advise and assist him. After the judge inquired whether he (the judge) had said anything to influence him in his decision the defendant replied in the negative. Thereupon the court asked the defendant if Jess Watson, the public defender, would be a satisfactory appointment to which the defendant answered "I have seen his name in the newspaper and I would be happy with him." (T. 1678).

Mr. Watson accepted the assignment at 3 o'clock on Friday afternoon. He was given access to the entire file of the district attorney and all statements which had been made by the state's witnesses. He devoted the rest of the week-end until the early morning hours of Monday to a concentrated study of this data along with conferrals with his new client. When the court reconvened on Monday Judge Williams made a detailed explanation to the jury concerning the illness of Attorney Genins and his consequent absence and inability to continue and the substitution of the public defender. (T. 1706 - 1707). No objection was made to such instruction nor was there a motion for mistrial nor a motion for continuance. There had been a previous motion for continuance on Friday which had been initially overruled (T. 1664) but that ruling was withdrawn when a recess was granted. (T. 1667).

As the Public Defender points out, Gideon v. Wainwright 372 U.S. 335 (9 L.Ed. 2d 799, 83 SC 792, 93 ALR 733) made clear that every person in our country charged with a felony has an unconditional and absolute constitutional right to have an attorney. That landmark decision appealed from Florida was decided in 1963. Benefit of counsel had been guaranteed to Georgians prior to the U. S. Supreme Court ruling as our Constitution of 1798 (Art. 3, § 8) had made such provision even though our first State Constitution (1777) did not contain a guaranty of counsel. Most interesting is the fact that Paragraph 1 of Article 1 of our 1861

State Constitution placed this in that part designated "Declaration of Fundamental Principles." It has since been restated in every successive State Constitution. We have regarded this as being of such importance that our state courts have ruled this right remains with the accused at every stage of trial. *Martin v. State,* 51 Ga. 567, 568; *Smith v. State,* 60 Ga. 430, 432; *Roberson v. State,* 135 Ga. 654 (2) (70 SE 175); *Duke v. State,* 104 Ga. App. 494 (122 SE2d 127).

But, just as other constitutional and statutory rights may be waived intelligently by an accused (*Jones v. Mills,* 216 Ga. 616 (2) (118 SE2d 484)), so too "The Constitutional guarantees of the benefit of counsel to a defendant in the trial of a criminal proceeding both federal . . . and state. . . may be waived by the defendant. [Cits.]" *Williams v. Gooding,* 226 Ga. 549 (1) (176 SE2d 64). See also *Ford v. State,* 227 Ga. 279, 281 (180 SE2d 545) and *Simmons v. State,* 126 Ga. App. 401 (190 SE2d 835). It is important to stress that "The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused." Johnson v. Zerbst, 304 U.S. 458, 464 (58 SC 1019, 82 LE 1461, 146 ALR 357). The U. S. Court of Appeals for the Fifth Circuit quoted this language with approval in Molignaro v. Smith, 408 F2d 795, 798.

There can be no question in the case sub judice that the accused made an intelligent and knowing waiver in desiring the case to be carried to a conclusion by substitute counsel. During his unsworn statement covering two days he related his life history in detail. This not only mentioned his college and medical school education but included his one year hospital residency as a psychiatrist and subsequent adult study for one-half year at an accredited law school. He further stated his experience in the courtroom as a witness in behalf of his patients, he having testified "approximately one hundred times." (T. 2135). Additionally, the record shows the court permitted him to conduct the cross examination of the state's medical witness as well as examination of a doctor who testified in his behalf. The skillful manner in which the accused interrogated these medical witnesses including complicated hypothetical questions demonstrated his ability as well as his possessing superior intelligence and mentality.

Where the record discloses no prejudice to a defendant by reason

of substitution of attorneys during a trial the defendant is not denied effective assistance of counsel. United States v. Stewart, 435 F2d 711 (5th Cir. 1970); United States v. Dykes, 460 F2d 324 (9th Cir. 1972).

Even recognizing that the accused here made an intelligent waiver it is still incumbent upon this court to make certain that his voluntary consent for substitution of counsel did not deprive him of his constitutional right of a fair trial. In examining this question we first consider the pressure of time. In Daugherty v. Beto, 388 F2d 810, 813, the U. S. Court of Appeals for the Fifth Circuit ruled that "Although this fact [that appointed counsel was a highly respected attorney] alone does not establish his effectiveness in a particular case, neither does brevity of consultation, without more, establish ineffectiveness." In the instant case the public defender devoted a week-end to acquainting himself with what had transpired. He was aided by being given all of the written statements of witnesses from the prosecutor's file. He also had the cooperation of a knowledgeable client. Furthermore, the court allowed him to recall for cross examination three of the main state's witnesses, including Janet and Jack Mott. In this respect we may conjecture that change of counsel might have helped the defense because of the contrasting cross examination styles of attorneys Genins and Watson. The predecessor advocate conducted a slashing aggressive cross examination with an insistence on every technicality, to the contrary, the public defender, an experienced trial lawyer who had served as a district attorney, sought to discredit these key witnesses with a "soft-sell" but searching cross examination. Thus the defendant received a benefit which would not have ordinarily occurred. The record further demonstrates the competence of Mr. Watson in his handling of the final week of the trial. He indeed met the requirement of providing "effective counsel," those being the key words according to Walker v. Caldwell, 472 F2d 1226 (5th Cir. 1973).

A further factor which we must mention is the exemplary manner in which Judge Osgood Williams conducted the trial. From its inception until its conclusion this learned jurist made certain that the defendant received all of his legal rights. His efforts to guarantee that the defendant received a fair trial appear throughout the extensive record. Not the least of these efforts were the explanations he made on his own volition in which he assumed responsibility for the frequent retirements of the jury

from the courtroom and absolved counsel of any blame for such necessity so that the laymen would not thereby be prejudiced against either the state or the accused. Another action for which he should be commended was his patience with and refraining from any interference with the accused during his lengthy two-days unsworn statement. This not only enabled the defendant to deal specifically with each element of the state's case including motives for each of the key witnesses but permitted defendant to present argumentative material which might well have convinced the jury to find the defendant innocent but for the strength of the prosecution's case. Confirmation that the defendant received a fair trial and also effective representation from both of his trial attorneys is shown in the jury having completely acquitted the accused on two indictments and on two counts in a third indictment.

9. *General grounds of new trial.* The verdict represented acceptance by the jury of the testimony of the state's witnesses despite the defendant's contention of their fraudulence and his attacks on their credibility concomitant with the jury's rejection of the defenses presented by the accused. "It was the province of the jury, and theirs alone, to put their appraisal upon the proofs submitted to them." *Ingram v. State,* 204 Ga. 164, 184 (48 SE2d 891). The trial court's overruling of the general grounds of the motion for new trial was not error.

*Judgment affirmed. Bell, C. J., Hall, P. J., Eberhardt, P. J., and Stolz, J., concur. Pannell and Quillian, JJ., concur in the judgment only. Deen and Evans, JJ., dissent.*

ARGUED MARCH 6, 1973 — DECIDED JULY 11, 1973 — REHEARING DENIED JULY 30, 1973 —

*Jess H. Watson,* for appellant.

*Lewis R. Slaton, District Attorney, James H. Mobley, Jr., Richard E. Hicks, Carter Goode, Morris H. Rosenberg, J. Melvin England,* for appellee.

EVANS, Judge, dissenting. A new trial should be granted because the trial was conducted by a disqualified jury, in that one of the jurors swore falsely on voir dire, prior to his selection as a juror, and thus induced defendant to accept him as a juror to serve in this case.

The trial was begun in April, 1971. The juror testified on voir dire examination prior to his selection, that *he had never served on any criminal jury.* On cross examination defendant's counsel

specifically inquired as to whether he had served on a particular criminal jury in 1969 in Fulton Superior Court, in which a human being was convicted and sentenced to die in the electric chair. Much detail surrounding the case was called to the prospective juror's attention, and a very thorough and exhaustive cross examination was conducted on this point, but the juror steadfastly maintained that he had not served on the jury, and had not participated in the conviction of a defendant whereby he was sentenced to die in the electric chair.

After conviction of the defendant in the case sub judice, Judge Williams conducted a special hearing on September 20, 1972, but the juror still maintained that he had not served on the jury that convicted the defendant who was thereby sentenced to death. He swore that if he did serve, he had no recollection of it. But it was proven that a certain person, residing at a certain address, and of a certain occupation, did serve as a juror on the aforementioned criminal case, and the juror admitted that this was his name, his occupation, and his address; and did not contend that any person with the same name and same occupation resided at said address. In fact he was the only person with that name in the Atlanta telephone directory. Thus, it was conclusively shown that the juror had sworn falsely on the voir dire examination in the instant case.

Further, the conclusion is inescapable that the juror deliberately and intentionally swore falsely, or that he was so afflicted in memory that he could not remember such an important occurrence in his life which happened just two years before when he answered on voir dire in April, 1972, and just three years before when the special hearing was conducted by Judge Williams in September, 1972.

In 1951 a new statute (Ga. L. 1951, pp. 214, 215; Code Ann. § 59-705) was enacted which greatly extended and expanded the right of litigants to conduct an exhaustive voir dire examination of prospective jurors. The new law did not limit the examination to questions which might per se disqualify the prospective juror from serving, but was all-inclusive so as to allow questions which might illustrate the bent of mind, leaning, or preferences of the juror, including "any interest of the juror in the cause, including any opinion as to which party ought to prevail, the relationship or acquaintance of the juror with the parties or counsel therefor, any fact or circumstance indicating any inclination, leaning or bias which the juror might have . . . and religious, social and fraternal connections of the juror."

A false answer by a juror to any of the questions on voir dire, whereby a party was induced to accept him as a juror in the particular case, was held ground for a new trial. In *Glover v. Maddox,* 100 Ga. App. 262 (5) (111 SE2d 164), it was specifically held that the false answer need not relate to a *disqualification* of the juror, in order to constitute error; and that a false answer as to whether he had ever been represented by opposing counsel, as a result of which he was accepted as a juror in that case, authorized the grant of a new trial.

Of course, it is still the rule—as it has always been—that where a party or his counsel has notice of some fact which might suggest not accepting the juror, and instead of exercising diligence to discover the truth, remains silent and inactive, this constitutes a waiver of the right to complain. See *Norman v. Norman,* 103 Ga. App. 626 (2) (120 SE2d 42).

The majority, in a rather extended discussion of this enumeration, seeks to gloss over this glaring error, and they labor tortiously to show that this event, of such devastating consequences to defendant, was really not an error of which complaint may be made. In support of their contention that no reversible error is shown, they argue as follows:

1. At page 493 they cite seven cases to show that a waiver occurs where the defendant by proper diligence could have ascertained the fact of disqualification and did not use diligence and did not object. We readily agree with this principle. But *not a one of these cases relates to questions propounded on the voir dire!* Since the new voir dire law was enacted in 1951, the place to exercise diligence is at the time the juror stands up and is subjected to interrogation under the voir dire principle. No lawyer could have been more diligent in trying to get the juror to admit his prior criminal service in a case where the defendant was convicted and sentenced to death than did counsel in the case sub judice. But no matter how hard they tried, no matter how greatly they went into detail, the juror professed that, "I am not the man," and that he had not served on that jury. This is the only diligence that was required and there was an over-abundance shown. They were entitled to rely on his answer as being truthful, and to thereby accept him as a juror, which they did.

2. The majority argues that, "in the instant case the juror was not per se disqualified." How can they make this positive assertion? If he testified truthfully, he was almost without any memory—he could not remember just two years before sitting on a jury in

Fulton County and convicting a defendant in a criminal case, and then hearing this fellow human being sentenced to die in the electric chair! Nor could he even remember *ever serving in any criminal case.* If he was truthful, he was without memory. Code § 59-804 (3) provides that idiots, lunatics and intoxicated persons are disqualified to serve as jurors.

3. The majority originally argued that *amnesia* might have caused this juror not to remember having served on the previous criminal jury that caused a man to be sentenced to death, under a human tendency to forget distasteful occurrences. With this admission by the majority, how can they contend that a person so afflicted with amnesia is a qualified juror?

4. The majority argues that the post-trial investigation did not reveal that the juror *had acted other than impartially.* What kind of investigation can be made into the mind of a juror who cannot remember two years back, as to a once-in-a-lifetime occurrence, or who deliberately and intentionally has sworn falsely in order to get on the jury. Could we accept his sworn statement: "I was impartial." Would that mean anything at all? Can the other eleven jurors render any aid whatever as to whether the mind of this juror was partial or impartial? Only the juror himself knew whether he acted partially or impartially, and his previous conduct precluded the resting of any judgment based on his testimony.

But the statement by the majority that the post-trial investigation did not reveal that the juror had "acted other than impartially" is hardly a fair statement, because that investigation did not reveal anything as to partiality or impartiality. He was not asked any question, nor was any other person asked any question, as to whether the juror acted partially or impartially. It would have been ridiculous to ask the juror—what answer would be expected? Furthermore, Judge Williams made no judgment or decision as to whether this juror acted partially or impartially.

5. The majority opinion states: "Therefore, we place our reliance on such authorities as *Kennedy v. State,* 191 Ga. 22 (11 SE2d 179) and *Jennings v. Autry,* 94 Ga. App. 344 (94 SE2d 629)." In this they go far afield! In the *Kennedy* case the juror stated that he was probably disqualified and defendant's counsel made no further investigation. How different from the case sub judice, where the juror in effect testified that he was *not* disqualified, and defendant's counsel sought with all diligence at their command to show he had served on a certain jury, which he steadfastly, though falsely, denied. In the *Jennings* case, it was shown that defendant's

counsel had some notice of relationship of the juror to a party, and did not thereafter exercise ordinary diligence to ascertain the truth, but remained silent, and allowed the juror to serve. But in the case sub judice, counsel did not remain silent, and did exercise more than ordinary diligence to discover the truth from the juror on an extensive and searching cross examination but was prevented by the juror's false answers to counsel's questions.

6. The majority opinion states: "If this juror had possessed a legal disqualification then a false answer which would have led to the exclusion of such juror would require a new trial. *Glover v. Maddox,* 100 Ga. App. 262 (5) (111 SE2d 164)." The majority opinion has completely failed to interpret and construe the *Glover* case, cited above, correctly. It was not a *legal disqualification* which the juror professed; he simply answered falsely as to whether he had ever been represented by opposing counsel. This, of course, was not a legal disqualification, but it was illustrative of his leaning or feeling, and counsel was entitled to have a truthful answer so he might strike the juror if he wished to do so. We repeat, the majority thinks the *Glover* case held that an untruthful answer as to a *legal disqualification* must be shown before a new trial would be granted. The contrary is true; any *untruthful answer* which illustrates the leaning, bias, etc. of the juror, whether it amounts to a legal disqualification or not, will authorize the grant of a new trial.

It is hard to conceive that the majority of this court is unwilling to grant to this defendant a new trial. His rights, in my opinion, are being flagrantly trampled and abused. The lower court is by the majority opinion affirmed, but consider the absolutely absurd and ridiculous reasons advanced for the affirmance, to wit:

a. The juror was not disqualified *per se,* because he falsely swore on voir dire in this case that he had not served as a juror in the earlier Cummings case. (No one has ever contended that he was *disqualified per se.* )

b. *Amnesia* may have caused the juror not to remember when he answered falsely on voir dire examination. (Why try to prop up the juror; he is not on trial yet?)

c. The post-trial investigations did not reveal the juror "acted other than impartially." (There was no post-trial investigation, absolutely none, as to the partiality or impartiality of the juror. How could his impartiality have been investigated? A juror is not allowed to impeach his own verdict. See Code § 110-109. But is there any person so naive as to believe the juror even, if the law

allowed him to impeach his own verdict—would come forward after verdict and swear, "I was partial and biased in favor of the State—I did not act impartially"?)

d. The majority cites seven cases on which they rely on the question of "failure to exercise diligence." Not a one of these cases deals with situations where questions were falsely answered on the voir dire examination. Further, the defendant was extremely diligent, calling the juror's attention to the Cummings case and trying to get him to remember it and when the juror answered he had not served on that case, the defendant had an absolute right to believe his answer and to accept the juror. (No right is afforded a party to bring in contradictory evidence to disprove the juror's sworn answer at this stage of the trial, under Code Ann. § 59-705.)

e. The majority says the defendant did not exhaust all of his strikes and cites cases in support thereof. (But not one of them deals with false answers to questions on voir dire examination. If the defendant had been allowed 50 additional strikes in this case, he would not have used a one of them on juror Noyes. He was satisfied with the juror and accepted him as a juror on the panel of 12 after the juror had testified under oath that he had not served on the Cummings case.)

f. The majority says that if the juror possessed a "legal disqualification" a false answer would have required a new trial. (They cite no case and cannot cite one that holds a false answer to voir dire examination under Code Ann. § 59-705 affords no right to a new trial unless the juror possessed a "legal disqualification.")

g. The majority places "our reliance" on such authorities as *Kennedy v. State,* 191 Ga. 22 (11 SE2d 179) and *Jennings v. Autry,* 94 Ga. App. 344 (94 SE2d 629). (There is no parity whatever; the *Kennedy* case is one where the juror said he was probably disqualified and defendant's counsel made no further investigation; in the *Jennings* case no question was asked the juror on voir dire examination, but defendant waited until after trial to investigate relationship.)

These, then, are the flimsy, erroneous, and utterly ludicruous reasons assigned by the majority opinion for their failure to grant a new trial to the defendant in this case.

I am indeed grateful for the privilege of dissenting.

7. In enumeration number 15 defendant complains of the court's admitting certain documents in evidence for the purpose of comparison of handwriting of the accused. He contends that Code § 38-709 was not complied with. The state contends that it

served *photo-static copies* of the documents upon defendant's counsel; and told him the state intended to use as evidence certain known handwriting of the defendant. Defendant's counsel (Tr. 1371) in reference to *copies* stated, "I can state in my place I was supplied with these documents." We repeat, this testimony was with reference to *copies, and not to the original documents*. State's counsel also stated, "When I furnished these copies to defense counsel, I received no further request . . ."

Service of photo-static copies of writings which are to be used as evidence for comparison purposes does not meet the requirements of Code § 38-709. The originals must be submitted. This was plainly held in *Mitchell v. State,* 89 Ga. App. 80, 87 (78 SE2d 563).

The majority cites and relies on *Padula v. State,* 119 Ga. App. 562 (167 SE2d 696), but the facts in that case are in no wise similar to the facts in the case at bar. In *Padula,* it was held that no reversible error was shown where the original documents were admitted in evidence, and where state's counsel, before the case began, exhibited the original documents to defendant's counsel, and several weeks before the trial told defendant's counsel the state had the documents and intended to use them and further told counsel that the documents *"were available."* But in the case sub judice state's counsel never at any time told defendant's counsel that the documents were available; nor was there any indication made to suggest to defendant's counsel that he could see the original documents. To the contrary, state's counsel, as his sole excuse, said that, "I received no further request."

The law imposes no duty or burden upon defendant's counsel as to inspection of original documents in cases where they are to be introduced for comparison of handwriting. The duty is on the party who intends to introduce the documents. The language of the statute is as follows: Code § 38-709. "Other writings, proved or acknowledged to be genuine, may be admitted in evidence for the purpose of comparison by the jury. *Such other new papers, when intended to be introduced, shall be submitted to the opposite party before he announces himself ready for trial."* (Emphasis supplied.) This language is cogent, clear and unmistakable in intent. The *originals* must be submitted, *not copies*. The opposite party has no duty of going to state's counsel and requesting permission to be allowed to look at the documents; state's counsel has the duty of submitting them to him in advance of trial.

State's counsel here was under a misconception of his duties in this matter. He felt he could serve copies and thereafter it was

incumbent upon defendant's counsel to make a request that he be allowed to inspect the original documents. The law is exactly the reverse of the foregoing.

The error here complained of requires the grant of a new trial.

I am authorized to state that Judge Deen concurs with this dissent.